HAMILTON PARTNERS, L.P., a New Jersey limited partnership, Plaintiff,

v.

Murry ENGLARD, Howard Berg, Yoram Hacohen, and Yitz Grossman, Defendants,

and

New York Healthcare, Inc. and The Bio Balance Corp., Nominal Defendants.

C.A. No. 4476–VCL.

Court of Chancery of Delaware.

Submitted: Sept. 17, 2010.
Decided: Dec. 15, 2010.

See also, 2006 WL 6031870 and 47 A.D.3d 676, 849 N.Y.S.2d 300.

Ronald A. Brown, Jr., Marcus E. Montejo, Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Attorneys for Plaintiff.

Martin S. Lessner, Alex D. Thaler, Young Conaway Stargatt & Taylor, LLP,

Wilmington, Delaware; Howard Kleinhendler, Meagan Zapotocky, Wachtel & Masyr, LLP, New York, New York; Attorneys for Defendants Murry Englard, Howard Berg, Yoram Hacohen, New York Health Care, Inc., and The Bio Balance Corp.

Neal J. Levitsky, Seth A. Niederman, Fox Rothschild LLP, Wilmington, Delaware; Stuart A. Blander, Alan A. Heller, Heller, Horowitz & Feit, P.C., New York, New York; Attorneys for Defendant Yitz Grossman.

## OPINION

LASTER, Vice Chancellor.

Plaintiff Hamilton Partners, L.P. owns approximately 4% of the common stock of nominal defendant New York Health Care, Inc. ("NYHC"), a de-listed New York corporation. Nominal defendant The Bio Balance Corp. ("Bio Balance"), a Delaware corporation, is a wholly owned subsidiary of NYHC. Three of the individual defendants—Murry Englard, Howard Berg and Yoram Hacohen (the "Director Defendants")—serve as directors of both NYHC and Bio Balance. The second amended complaint (the "Complaint") asserts a derivative claim on behalf of NYHC and a double derivative claim on behalf of Bio Balance, each for breach of fiduciary duty by the Director Defendants. The Complaint also asserts a claim for conspiracy (which I construe as a claim for aiding and abetting a breach of fiduciary duty) against Yitz Grossman, the principal beneficiary of the underlying transaction challenged in the case.

The defendants have filed motions to dismiss for (i) lack of personal jurisdiction over Grossman, (ii) lack of personal jurisdiction over parties necessary to adjudicate the derivative actions, (iii) failure to make demand or plead demand futility,

and (iv) failure to state a claim on which relief can be granted. They also rely on the doctrine of *forum non conveniens.*

This Court lacks personal jurisdiction over the Director Defendants in their roles as directors of NYHC, and the Complaint is dismissed to the extent it asserts a standard derivative action on behalf of NYHC. Otherwise, the motions are denied.

## I. FACTUAL BACKGROUND

 The facts are drawn from the well-pled allegations of the Complaint, which are assumed to be true at this stage of the proceeding, and from the documents that the Complaint incorporates by reference. The non-movant plaintiff receives the benefit of all reasonable inferences. I take judicial notice of NYHC's public filings, the pleadings in a prior lawsuit in New York, and the complaint in a related action in this Court.

### A. The Grossman–Datys Group

Defendant Grossman is a convicted felon who pled guilty to perpetrating a pump-and-dump scheme involving the stock of NYHC. Grossman's conviction and subsequent 41–month prison term capped a checkered career as a broker and promoter in the securities industry. Two prior incidents of fraud stand out. In 1984, Grossman was found guilty of misappropriating customer funds. In 2002, Grossman was held liable for violating Florida's Blue Sky Laws while promoting the shares of Buzzeo, Inc.

One of Grossman's long-time colleagues is non-party Harry Datys, an individual previously convicted of criminal possession of narcotics with intent to distribute. Datys worked as a broker for A.S. Goldmen & Company, a now-defunct firm whose name became synonymous with securities

fraud. Compl. ¶ 48.[1] From 1995 until 2002, Datys worked for Joseph Stevens & Company, another shuttered brokerage firm whose business practices led to criminal indictments.[2] During that time, Datys was the subject of four customer complaints that settled, respectively, for $550,000, $195,000, $52,500, and $45,000. While an additional charge was under review, Datys moved on to Sterling Financial Investment Group, Inc. There, Datys was the subject of a customer complaint that led to litigation in the Western District of Texas. Datys then became a broker with Westpark Capital, Inc., where he stipulated to a denial of his license in Colorado after being charged with securities fraud by the Colorado Division of Securities. He also was fined $6,000 and had his securities license denied by the New Jersey Bureau of Securities for violating a supervisory agreement.

Grossman and Datys have worked together frequently. They solicited investors together for Buzzeo (the transaction on which Grossman was convicted of violating Florida's Blue Sky Laws), as well as for Vizacom, Inc., Sagemark Companies Ltd., Multi Media Tutorial Services, Mark Solutions, Inc., and Amanda Co. Compl. ¶ 48. Recently they have participated in organizing a series of thirty-three structurally identical Delaware corporations formed to access the public markets through transactions with registered penny stock issuers.[3] Compl. ¶¶ 50–51.

---

1. In 1999, Manhattan District Attorney Robert M. Morgenthau indicted the firm and 26 employees on charges of securities fraud that cost thousands of investors $100 million in losses. Gretchen Morgenson, *Brokerage Firm Is Indicted In Fraud Case*, N.Y. Times, July 9, 1999, *available at* http://www.nytimes.com/1999/07/09/business/brokerage-firm-is-indicted-in-fraud-case.html. The firm and five of its top managers were convicted on fraud charges, including charges of enterprise corruption. The individuals were sentenced to lengthy prison terms and required to pay restitution to victims. New York County District Attorney's Office, *Investigation Division Cases—People v. A. S. Goldmen & Co. Case Summary*, http://manhattanda.org/officeoverview/cases/trials/as_goldmen.htm.

2. In 2009, the Manhattan District Attorney charged the firm, its two owners, three traders, and eleven brokers with fraud arising out of activity that occurred from January 2001 through December 2005. Dareh Gregorian, *Joseph Stevens & Co. Firm Busted*, N.Y. Post, May 21, 2009, *available at* http://www.nypost.com/p/news/business/item_KSALHlvshL359nuAogLzRK.

3. I use the term "penny stock" colloquially to refer to a speculative security, typically trading on the pink sheets at prices in the single digits and often for less than $3 per share, issued by a small, newly formed, or development-stage corporation with a minimal market capitalization and a thin and illiquid float, and for which little information is available to investors. Penny stocks have long provided opportunities for the unscrupulous to engage in fraud. *See generally* O. Dennis Hernandez, Jr., *Broker–Dealer Regulation Under the New Penny Stock Rules: An Appraisal*, 1993 Colum. Bus. L.Rev. 27, 29–32 (1993); William H. Lash, III, *Loose Change: The Campaign for Penny Stock Reform*, 60 U.M.K.C. L.Rev. 1, 1–13 (1991). In 1990, Congress passed the Securities Enforcement Remedies and Penny Stock Reform Act in an effort to reduce the incidence of penny stock fraud. *See* Pub.L. No. 101–429, 104 Stat. 931 (1990).

After the Penny Stock Reform Act passed, the North American Securities Administrators Association expressed concern that fraudsters would evade its strictures by shifting to poorer quality issuers falling below the Act's definitional requirements. *See* Carolyn E. Lampe, Comment, *The Penny Stock Reform Act of 1990: A Costly Solution to a Serious Problem*, 13 Geo. Mason L.Rev. 779, 788 (1991). The warning proved prescient: "[T]he Penny Stock Act has proven to be mostly a paper tiger since its provisions, as adopted by the SEC in the Penny Stock Rules, can be easily circumvented simply by evading the statutory definition of a penny stock as set forth in Rule 3a51–1. Consequently, microcap securities fraud has continued more or less unabated through to the present day." Kevin C. Bartels, Note, *"Click Here To Buy the*

Over the years, a number of individuals have repeatedly invested in transactions organized or promoted by Grossman and Datys. Just as Michael Milken was able to assemble a consortium of investors who could be counted on to buy junk bonds issued by Drexel Burnham clients, enabling him to perfect the "highly confident" letter, so too Grossman and Datys have assembled a stable of associates who back their schemes. Many of the same investors appear in every one of the thirty-three recent blank check transactions, including defendant Berg, Kathleen Datys, Timothy J. McCartney, Jeffrey Rubin (through his entity J & N Invest LLC), Frederic Colman, John O. Forrer, Samuel Soloman, Richard & Donna Hoefer, David C. Katz, Paul Northcutt, Marvin Rosenblatt, Steven Rothstein, Fredrick and Rebecca Utter, and David Clarke. Members of the Grossman–Datys stable who have participated in other transactions include defendant Englard and his wife Lemore Englard, Grossman's wife Lisa Grossman, Grossman's father-in-law Irv Bader, family member Zachary Grossman, and Grossman's sister Mina Bartfeld. Compl. ¶¶ 50–52.

## B. Grossman Forms Bio Balance Corp.

In summer 2001, Grossman formed Bio Balance[4] to acquire the intellectual property rights to "biobalance," a health product marketed as a treatment for irritable bowel syndrome. In July 2001, Grossman succeeded in procuring the rights to "biobalance." Funding for the purchase was provided by familiar Grossman–Datys associates, including defendant Berg. The purchase agreement required that Bio Balance enter into a business combination with a publicly traded company or complete an initial public offering by January 2, 2003.

During the same period, Grossman caused Bio Balance to enter into a consulting agreement with himself and Emerald Asset Management, Inc., a New York corporation wholly owned by Grossman (the "Consulting Agreement"). Pursuant to the Consulting Agreement, Grossman com-

---

Next Microsoft": The Penny Stock Rules, Online Microcap Fraud, and the Unwary Investor, 75 Ind. L.J. 353, 354 (2000) (internal footnote omitted). Although I have not conducted a detailed analysis, the allegations of the Complaint and information in publicly available filings suggest that a number of the issuers who garnered attention from Grossman, Datys, and their associates would not meet the relatively minimal federal requirements. See 15 U.S.C. § 78c(a)(51) (providing statutory definition of penny stock); 17 C.F.R. § 240.3a51–1 (providing regulatory definition).

Grossman and Datys' recent foray into microcap blank check companies adds to the overall picture. "Blank check companies were common instruments of fraud in the 1980s, particularly in the penny stock market." Daniel S. Riemer, Note, Special Purpose Acquisition Companies: SPAC and Span, or Blank Check Redux?, 85 Wash. U.L.Rev. 931, 932 (2007) (internal footnotes omitted); Tim Castelli, Note, Not Guilty By Association: Why the Taint of Their "Blank Check" Predecessors Should Not Stunt the Growth of Modern Special Purpose Acquisition Companies, 50 B.C. L.Rev. 237, 238–39 (2009) (noting that special purpose acquisition vehicles "evoke images of the 'blank check' companies of the 1980s that thrived amidst a penny stock market dominated by fraudulent and manipulative trading practices" (internal footnotes omitted)). As products of human ingenuity, market-accessing vehicles like SPACs, blank check companies, and blind pools can be used for good or ill. The blank check activities discussed in the Complaint could well prove legitimate. For now, they add a supporting element to the Complaint's disturbing montage.

4. Bio Balance originally was formed under the name "The Zig Zag Corporation." After acquiring the rights to "biobalance," Grossman changed its name to "The Bio Balance Corporation." For simplicity, I refer to the entity consistently as Bio Balance.

mitted to provide part-time consulting services to Bio Balance. In return, Bio Balance committed to provide Grossman with $250,000 in annual cash compensation, bonuses as determined by the Bio Balance board of directors, warrants to purchase 200,000 Bio Balance shares, an office in New York City with secretarial support, a luxury automobile and payment for any related expenses, and medical, dental, life and disability insurance for Grossman and his immediate family.

The Consulting Agreement was dated June 1, 2001, and had a term of eight years. Either party could terminate the Consulting Agreement at will, but if Bio Balance terminated the agreement without cause, then Grossman would be entitled to a lump sum cash payment of $750,000 plus three times his highest bonus from the preceding three years. His insurance benefits would continue for five years unless Bio Balance substituted an up-front payment equal to their present value. Alternatively, Bio Balance could terminate the Consulting Agreement for cause, "without any further liability hereunder to Emerald, [Grossman] or his estate," in the event of "[f]raud, misappropriation or embezzlement by Emerald [or Grossman] in connection with the Company; or . . . [c]onviction by a court of competent jurisdiction in the United States of a crime which involves moral turpitude." Compl. ¶ 18.

On October 11, 2001, Bio Balance entered into an agreement for a stock-for-stock merger with NYHC, whose shares were registered on the Boston Stock Exchange and traded publicly on the NASDAQ Small Cap Market. Bio Balance's counsel at the time was Edward Grushko, an attorney previously disbarred in New York (although later readmitted) after pleading guilty in Las Vegas federal court to conspiracy to commit securities fraud. Compl. ¶ 45. The transaction eventually closed on January 2, 2003, the day of the deadline set in the purchase agreement for Bio Balance to access the public markets. As a result of the transaction, Bio Balance's 278 stockholders exchanged their unregistered shares of a non-public entity for approximately 89.7% of the issued and outstanding common stock of NYHC.

### C. Grossman Pleads Guilty To Securities Fraud.

On November 19, 2003, the United States Attorney for the Southern District of New York indicted Grossman and a colleague for conspiring to manipulate the price and demand of NYHC's common stock. The illegal acts dated back to February 2003, just after Bio Balance merged with NYHC. According to the indictment, Grossman met with an undercover FBI agent posing as the manager of a hedge fund and proposed that the hedge fund purchase 1.325 million shares of NYHC for approximately $7 million, representing a price of approximately $5.28 per share. In exchange, NYHC would secretly issue to the agent warrants to purchase 500,000 shares of NYHC common stock at an exercise price of $2.50 per share. To conceal the transfer, NYHC would issue the warrants to a foreign company set up by Grossman, after which control of the company would pass to the agent. Grossman planned for the $7 million purchase to drive up the price of NYHC's common stock, at which point the agent could exercise the secretly issued warrants and enjoy anticipated profits of $1.75 million.

Grossman pled guilty to conspiracy to commit securities fraud, mail fraud, and commercial bribery. He was sentenced to 41 months incarceration in federal prison. In April 2004, NYHC's shares were delisted as a result of his crimes.

## D. After a Brief Interlude, Grossman's Allies Regain Control of NYHC.

Following Grossman's conviction, NYHC's board of directors appointed Dennis O'Donnell as President of the company. O'Donnell was a seasoned and accomplished pharmaceutical executive with over twenty years experience at companies such as Wyeth and Bristol–Myers. O'Donnell terminated the Consulting Agreement for cause. He also pursued a series of legitimate capital-raising and business transactions that would have diluted the ownership stake of the original Grossman–Datys investors.

In response, a group of Grossman–Datys investors acted to regain control of NYHC. In June 2005, the holders of approximately 13.6% of NYHC's outstanding common stock (17.6% assuming the exercise of warrants) filed a Schedule 13D demanding a special meeting of stockholders within 65 days for the purpose of electing new directors (the "Change of Control Filing"). The signatories to the Change of Control filing were defendant Berg, Kathleen Datys, Mina Bartfeld, Timothy J. McCartney, Fedric Colman, Kal Zeff, Jerry and Lilli Weinger, Mark Olshenitsky, John Forrer, Richard Molinsky, Victor Molinsky, Maria Molinsky, Richard and Judith Pawlinger, Daniel Eichner, Benjamin and Elaine Blech, and Jeffrey Rubin.

The investors who executed the Change of Control Filing had close ties to Grossman and Datys. Berg, Colman, Forrer, and McCartney participated in every one of the thirty-three Grossman–Datys blank check company investments. Kathleen Datys, the Weingers, Olshenitsky, and the Pawlingers held their shares through Sterling Financial, where Harry Datys operated at the time. Mina Bartfeld is Grossman's sister. Suggesting that birds of a feather do flock together, and reminiscent of Grossman and Datys' own legal difficul-

ties, signatory Richard Molinsky pled guilty to market manipulation and fraudulent sales practices in connection with his activities at the defunct brokerage firm D.H. Blair & Co.

In August 2005, NYHC held its annual meeting. The proxy statement listed three Gibraltar-based entities—Hershey Holdings, Birizima Associates and Nekavim Investors—as the largest holders of NYHC stock with approximately 17.9% of the shares. According to the Complaint, Grossman directs the investment activity of these entities. The three foreign entities plus the Change of Control Filing signatories together controlled over 30% of the outstanding shares.

NYHC's three independent directors— Mordecai H. Dicker, Fred E. Nussbaum and Mark Gray—conceded the field and chose not to stand for reelection. NYHC's stockholders elected a board consisting of defendant Englard, Stuart Ehrlich, Michael Nafash, and O'Donnell. According to the proxy statement, NYHC's Corporate Governance and Nominating Committee nominated Nafash on O'Donnell's recommendation and Ehrlich and Englard at the request of the signatories to the Change of Control Filing.

Englard and his wife have close ties to Grossman. In February 2006, articles of incorporation were filed for Med–Dynamix, Inc., a Nevada corporation. Englard is President and a director. Grossman's wife is Secretary. In May 2006, Englard's wife and Grossman jointly obtained a mortgage for $540,000 for a property located at 1467 71st Street, Brooklyn, New York. They jointly sold the property in 2008. Englard serves as an accountant for Arevim, Inc., a Delaware corporation formed by Grossman. Arevim's officers include Grossman and his wife, and its principal place of business is Grossman's home address.

## E. The First Settlement

Shortly after the newly constituted board took office, Grossman contacted NYHC from federal prison, asserted that the Consulting Agreement was terminated without cause, and demanded payment of more than $2,225,000. Despite the prior termination of the Consulting Agreement for cause and the provision contemplating no further liability if Grossman engaged in fraud, the new board entered into a settlement agreement with Grossman. The agreement, dated March 1, 2006, (the "First Settlement") provided Grossman with (i) an immediate cash payment of $700,000, (ii) aggregate payments of $396,000 to be made in monthly increments of $22,000, (iii) 400,000 shares of NYHC common stock with a one-time demand registration right and unlimited piggy-back registration rights, (iv) options to purchase 1,100,000 shares of NYHC at $.78 per share, and (v) health insurance for Grossman and his immediate family for eighteen months.

In response to the First Settlement, a stockholder derivative action was filed in New York State Court, *Glatzer v. Grossman*, 2006 WL 6031870 (N.Y.Supr. Sept. 18, 2006). The suit alleged that the NYHC directors breached their fiduciary duties by entering in to the First Settlement and that demand was futile because the board was controlled by Grossman and Datys. At the time of filing, the board consisted of England, Ehrlich, Nafash, and O'Donnell.

While the case was pending, NYHC rescinded the First Settlement. The defendants asked the New York court to take judicial notice of the rescission and urged the judge to infer that because no settlement payments were made to Grossman, it was "implausible that Grossman and Emerald controlled the Director Respondents' decisions." Compl. ¶ 40. The New York court regarded the complaint as containing only conclusory allegations regarding Grossman and Datys' control over a majority of the directors who were then on the board, and thus demand futility was not pled. The court further held that the defendants were protected from any liability for damages by the exculpatory provision in the NYHC charter. The court granted the defendants' motion to dismiss on September 18, 2006. The decision was affirmed on January 15, 2008. *Glatzer v. Grossman*, 47 A.D.3d 676, 849 N.Y.S.2d 300 (2008).

O'Donnell opposed the First Settlement from its inception, stating that he believed the board was acting "without any sense of what was right." Compl. ¶ 36. He similarly disapproved of the handling of the *Glatzer* case. On September 6, 2006, he resigned. On September 22, Ehrlich followed suit.

The remaining two directors then acted by unanimous written consent to fill the resulting vacancies with defendants Berg and Hacohen. Berg was one of the original investors in Bio Balance and is a long-time client of Datys and Grossman. Hacohen allegedly has served as Datys and Grossman's corporate attorney and assisted them in structuring their various corporate transactions. Compl. ¶¶ 7, 38.

On April 3, 2007, Nafash resigned from the Board, leaving defendants Berg, England, and Hacohen as the directors of both NYHC and Bio Balance.

## F. The Second Settlement.

On April 24, 2008, approximately three months after the order affirming the *Glatzer* dismissal eliminated any continuing threat from that case, Grossman contacted NYHC and demanded performance of the First Settlement. The new board entered into a different settlement agreement with

Grossman that provided even greater consideration, albeit marginally less cash up front (the "Second Settlement").

Like the First Settlement, the Second Settlement called for an initial cash payment to Grossman, but it reduced the amount from $700,000 to $650,000. The Second Settlement also called for on-going payments to Grossman, but it reduced the aggregate payments of $396,000 (payable in monthly installments of $22,000) with a one-year consulting agreement worth $180,000 and the opportunity to earn an additional bonus of up to $180,000. Compl. ¶ 43. In lieu of the equity in NYHC contemplated by the First Settlement, the Second Settlement provided for the formation of a Delaware limited liability company, Bio Balance, LLC. To avoid confusing the alternative entity with Bio Balance, I will refer to Bio Balance, LLC as "Transaction LLC."

Under the Second Settlement, Bio Balance agreed to transfer all of its intellectual property rights to Transaction LLC. As of December 31, 2007, Bio Balance claimed rights to fourteen patents issued in the United States and two patent applications filed and pending, with expiration dates ranging from 2020 to 2023. The stated value of the patents was $628,056. In addition, NYHC agreed to fund Transaction LLC with $2,000,000. One third of membership interests in Transaction LLC went to Grossman with Bio Balance retaining the other two-thirds interest.

Recall that under the Consulting Agreement, Bio Balance had the absolute right to terminate the agreement for cause, without any further liability to Grossman, if Grossman engaged in fraud "in connection with" NYHC or Bio Balance. Recall also that Grossman pled guilty to securities fraud for a pump-and-dump scheme involving NYHC's stock. From prison, he made an opening demand for $2,225,000 in

compensation for the alleged breach of the Consulting Agreement. After rescinding the First Settlement in response to a stockholder challenge, the Director Defendants agreed in the Second Settlement to provide Grossman with up-front cash of $830,000 and a membership interest in Transaction LLC with an implied value of $876,019.

On July 24, 2008, in accordance with the Second Settlement, NYHC's corporate counsel filed a certificate of formation for Transaction LLC with the Delaware Secretary of State. On August 12, 2008, the Second Settlement was finalized and executed.

### G. This Litigation And The Attempted Enterologics Transaction

On April 3, 2009, Hamilton Partners filed this action. On July 8, 2009, after the defendants moved to dismiss, Hamilton Partners amended the complaint to add jurisdictional allegations and to assert a claim against Grossman for civil conspiracy. The defendants again moved to dismiss.

On February 12, 2010, I conducted a hearing on the defendants' motions during which I expressed skepticism about their jurisdictional defenses in the event the pleading was construed to assert a double derivative claim on behalf of Bio Balance. I granted the plaintiff leave to amend to plead a double derivative theory explicitly. On March 8, 2010, Hamilton Partners filed the currently operative pleading.

The defendants again moved to dismiss. They also sought to alter the factual landscape on which the case would be litigated. On June 15, 2010, Transaction LLC entered into a binding letter of intent to sell its assets to Enterologics, Inc., a publicly traded Nevada shell corporation. Under the letter of intent, in return for its assets,

Transaction LLC would receive a mutually agreed upon number of shares of Enterologics' preferred stock, not to exceed 20% of the Enterologics equity. The letter of intent contemplated few preferences for the preferred stock, which would be functionally equivalent to common.

Enterologics has extensive ties to Grossman. The company was incorporated in the State of Nevada on September 2, 2009. That same month, Enterologics sold 10,300,000 shares to its "four founders" for $1,030 ($.0001 per share). Approximately 75% of those shares were sold to Grossman's wife, Lisa Grossman, who serves as a director and Secretary of Enterologics. Later in 2009, Enterologics sold a total of 15,700,000 shares of common stock to 55 individuals for cash of $47,080 and a subscription receivable of $20 ($.003 per share). Irv Bader, Grossman's father-in-law, acquired 2,500,000 of the shares, and Zachary Grossman, another Grossman relative, acquired another 2,500,000 of those shares. Lisa Grossman, Irv Bader, and Zachary Grossman collectively hold approximately 57% of Enterologics' outstanding common stock. Other Enterologics investors hale from the Grossman–Datys stable, including Richard Molinsky and Jeffrey Rubin (through J & N Invest LLC), both of whom executed the Change of Control Filing and who have participated in the recent Grossman–Datys blank check transactions. Enterologics shares office space with The Meister Group, which is wholly owned and controlled by Grossman. Start-up funding for Enterologics was provided by The Meister Group. The principal executive officer of Enterologics is Robert Hoerr, the former Director of Medical and Regulatory Affairs for Transaction LLC.

On February 17, 2010, Enterologics filed with the SEC a registration statement for the resale of 15,700,000 shares of common stock. On April 7, 2010, after the registration statement became effective, Enterologics filed a prospectus for the sale of the shares. According to the prospectus, Enterologics raised $47,100 in a fully subscribed private placement of its common stock. As of December 31, 2009, Enterologics had a remaining cash balance of $43,694. Enterologics has no other assets and no products. As of June 30, 2010, according to Enterologics' Form 10–Q filing, Enterologics had no operations, no revenues, and had recorded a net loss of $53,029 since inception.

Under the binding letter of intent with Transaction LLC, Enterologics committed to raise $1 million in capital within one year of the asset purchase. Assuming Transaction LLC received its maximum potential equity stake of 20%, the implied value of the consideration provided by Enterologics topped out at $200,000. Through its two-thirds membership interest in Transaction LLC, Bio Balance would receive (indirectly) value of $137,000. At the time of the Second Settlement, the stated value of Transaction LLC's intellectual property was $628,000 and NYHC funded Transaction LLC with an additional $2 million in cash.

Hamilton Partners responded with a new action styled *Hamilton Partners, L.P. v. Englard*, C.A. No. 5637–VCL (the "Enterologics Action"), which challenged the transaction as a further breach of fiduciary duty by the Director Defendants. A pungent aroma surrounded the Enterologics deal, which bore many of the hallmarks of incipient penny stock fraud.[5] Like the Second Settlement, the transaction ap-

---

**5.** *See* Joseph I. Goldstein et al., *An Investment Masquerade: A Descriptive Overview of Penny Stock Fraud and The Federal Securities Laws,* 47 Bus. Law. 773, 774–96 (1992) (describing typical characteristics of a penny stock fraud scheme); Lampe, *supra,* at 780–86 (same).

peared designed to benefit Grossman and his associates at the expense of Bio Balance and NYHC. The nature and timing of the transaction also suggested an effort to deprive this Court of jurisdiction over the assets that are the subject matter of this litigation. The attempt to influence the judicial process through corporate self-help hearkened back to the defendants' temporary cancellation of the First Settlement during the pendency of the *Glatzer* litigation, which they cited as evidence of their independence, only to agree to the Second Settlement as soon as the *Glatzer* action was finally dismissed.

On July 21, 2010, I heard argument on Hamilton Partners' motion for expedited proceedings in the Enterologics Action. I denied the motion because damages against the individual defendants would provide an adequate remedy. According to a Form 8–K dated September 1, 2010, Enterologics and NYHC later rescinded the letter of intent.

## II. LEGAL ANALYSIS

Hamilton Partners has styled its complaint as both a standard derivative action on behalf of NYHC and a double derivative action on behalf of Bio Balance. *See Lambrecht v. O'Neal,* 3 A.3d 277, 281–82 (Del.2010) (distinguishing between two forms of action). The Director Defendants serve as the directors of both corporations. Grossman is named as a defendant for having conspired with the Director Defendants at both levels.

### A. Personal Jurisdiction Over Grossman

▮ Specific personal jurisdiction exists over Grossman for purposes of challenging the Second Settlement. Under the circumstances, the jurisdiction-conferring act of forming Transaction LLC can be attributed to Grossman. "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.,* 449 A.2d 210, 225 (Del.1982).

▮ The Delaware Long–Arm Statute provides:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State. . . .

10 *Del. C.* § 3104(c). "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction." *Crescent/Mach I P'rs, L.P. v. Turner,* 846 A.2d 963, 974 (Del.Ch.2000). Forming a Delaware entity for the purpose of engaging in a transaction constitutes the "transaction of business" within the State of Delaware sufficient to confer specific personal jurisdiction over the party forming the entity under Section 3104(c)(1).[6] The determinative questions

---

6. *See Papendick v. Robert Bosch GmbH,* 410 A.2d 148, 152 (Del.1979); *Cairns v. Gelmon,* 1998 WL 276226, at *3 (Del.Ch. May 21, 1998); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.05[c][3], at 3–98 (2010) ("[I]n suits in

which the incorporation of a Delaware subsidiary is an integral component of the conduct giving rise to the cause of action, the Delaware courts have consistently recognized that a nonresident defendant's incorporation of such subsidiary constitutes sufficient 'minimum contacts' with Delaware.").

for analysis are (i) whether the act of forming Transaction LLC can be attributed to Grossman for purposes of making him amenable to service under Section 3104(c)(1), and (ii) whether the resulting assertion of personal jurisdiction over Grossman comports with constitutional notions of due process.

 Section 3104(c) is to be "broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause." *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del.1992).

> [T]rial courts must give a broad reading to the terms of the long-arm statute[ ] in order to effectuate the statute's intent to ensure that this state's court may exercise jurisdiction to the full limits permissible under the Due Process Clause. In other words, the Supreme Court has instructed that trial courts should permit service under § 3104 if the statutory language plausibly permits service, and rely upon a Due Process analysis to screen out uses of the statute that sweep too broadly.

*Sample v. Morgan*, 935 A.2d 1046, 1056 (Del.Ch.2007) (internal footnotes omitted); *accord Chandler v. Ciccoricco*, 2003 WL 21040185, at *11 (Del.Ch. May 5, 2003) ("Any problems of overbreadth by such a liberal construction [of Section 3104] can be policed by application of the minimum contacts analysis under the due process clause of the Fourteenth Amendment.").

 In *Istituto Bancario*, the Delaware Supreme Court held that a foreign defendant may be subject to jurisdiction in De-

laware, despite lacking direct forum contacts of its own, where it acts as part of a scheme in which others engaged in Delaware-directed activity. 449 A.2d at 225. The case identified five elements that "provide a framework with which to analyze a foreign defendant's contacts with Delaware" for purposes of the Due Process Clause. *See Hercules*, 611 A.2d at 482 & n. 6. When considering the five elements, a court "is not necessarily limited in its analysis to those acts upon which service of process under Delaware's long arm statute is based," *viz.* the formation of Transaction LLC, but may evaluate the allegations of the complaint more broadly. *Id.* at 482.

 The first and second *Istituto Bancario* elements are whether a conspiracy existed and whether the foreign defendant was a member of the conspiracy. 449 A.2d at 225. Although *Istituto Bancario* literally speaks in terms of a "conspiracy to defraud," the principle is not limited to that particular tort. *See id.* at 222–25 (describing underlying theory without fraud-based limitation); *Crescent/Mach I*, 846 A.2d at 977 (rejecting construction that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders"). The reference to fraud stems from that being the claim actually asserted by the *Istituto Bancario* plaintiff.[7]

 "[I]n cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law." *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910

---

**7.** *See* 449 A.2d at 212 (describing complaint's contention that "shares were fraudulently issued"); *id.* (noting allegation that "several defendants conspired to defraud the plaintiff by diluting its stockholding in Hunter"); *id.* at 216 (referring to alleged "conspiracy between the defendants to utilize the laws of the State of Delaware to defraud IBI"); *id.* at 217 ("IBI further argues that such shares were issued as the result of an allegedly fraudulent scheme to deprive IBI of its security interest."); *id.* at 222 (describing plaintiff's contentions about "the involvement of the defendants in a conspiracy to defraud IBI by depriving it of its security interest in Hunter").

A.2d 1020, 1038 (Del.Ch.2006). Sufficiently pleading a claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Istituto Bancario* test. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del.Ch. Feb.4, 2005); *Crescent/Mach I*, 846 A.2d at 977.

The Complaint pleads that Grossman conspired with the Director Defendants to engage in a breach of the fiduciary duty of loyalty. Hamilton Partners clothed its count against Grossman in conspiracy garb to come within the literal language of *Istituto Bancario*. I have no difficulty construing it as an aiding and abetting claim. *See Allied Capital*, 910 A.2d at 1038–39. As discussed below, the Complaint credibly asserts that the Director Defendants breached their fiduciary duties under both New York and Delaware law and that Grossman aided and abetted the breach. *See, infra,* Part II.E.

The analysis holds if Grossman's conduct is evaluated using the more generalized elements of civil conspiracy, which are: "(1) [T]wo or more persons; (2) an object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) damages as a proximate result thereof." Wolfe & Pittenger, *supra*, § 3.05[b], at 3–81 to 3–82. The Complaint adequately pleads that Grossman and the Director Defendants conspired for the improper purpose of diverting assets from NYHC and Bio Balance to Grossman. A meeting of the minds occurred with the structuring of the Second Settlement. Grossman and the Director Defendants knew of and approved the terms of the Second Settlement, including the creation of Transaction LLC. The Complaint pleads a complex web of financial dealings and connections between the Director Defendants and

Grossman sufficient to call into question the Director Defendants' independence at the pleading stage. The terms and timing of the Second Settlement are highly suspicious. The costs of the Second Settlement to NYHC and Bio Balance, and the concomitant benefits to Grossman, are significant and obvious. The benefits to NYHC and Bio Balance are murky at best, particularly given Grossman's guilty plea and the right to terminate the Consulting Agreement without liability in the event of fraud.

The third *Istituto Bancario* element is that "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state." 449 A.2d at 225. The formation of a Delaware entity or the filing of a corporate instrument in Delaware to facilitate the challenged transaction satisfies this element. *E.g., Benihana*, 2005 WL 583828, at *8 (certificate of designations); *Gibralt Capital Corp. v. Smith*, 2001 WL 647837, at *6 (Del.Ch. May 9, 2001) (certificate of designations); *Crescent/Mach I*, 846 A.2d at 977 (certificate of merger).

The fourth and fifth *Istituto Bancario* elements are that "the defendant knew or had reason to know of the act in the forum state" and that "the act in ... the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy." 449 A.2d at 225. Both are clearly met. The Second Settlement called specifically for the formation and use of Transaction LLC.

The resulting exercise of personal jurisdiction comports with due process. *See Istituto Bancario*, 449 A.2d at 225. Having engaged in conduct that involved the formation of a Delaware entity, Grossman should have "reasonably anticipated ... that his ... actions might result in the forum state exercising personal jurisdiction over him in order to adjudicate dis-

putes arising from those actions." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 50 (Del.Ch.1991) (Allen, C.). Not only did Grossman know that the creation of Transaction LLC would take place in the forum state, he affirmatively contracted for that event to occur by entering into the Second Settlement. By negotiating, structuring, and agreeing to a transaction in which a critical step was the formation of Transaction LLC, Grossman purposely availed himself of the benefits of Delaware law and subjected himself to suit in Delaware for purposes of a challenge to the Second Settlement.

### B. Personal Jurisdiction For The Bio Balance Double Derivative Action

 The Director Defendants contend that the Bio Balance double derivative action should be dismissed because this Court lacks personal jurisdiction over the necessary parties. In a double derivative action, the cause of action being pursued belongs to the subsidiary, and the subsidiary is therefore a necessary party for granting relief. *Ash v. McCall*, 2000 WL 1370341, at *13–14 (Del.Ch. Sept. 15, 2000) (dismissing purported double derivative claim for failure to name subsidiary as a party, "a prerequisite for asserting a double derivative action"). Bio Balance is a Delaware corporation and indisputably subject to jurisdiction in this Court.

 To adjudicate a double derivative claim for breach of fiduciary duty, this Court also must have jurisdiction over the alleged wrongdoers. Personal jurisdiction exists over the Director Defendants in their capacities as directors of Bio Balance. *See* 10 *Del. C.* § 3114(a); *Armstrong v. Pomerance*, 423 A.2d 174, 176–77 (Del. 1980). The Complaint alleges that the Director Defendants breached their fiduciary duties as directors of Bio Balance by approving the Second Settlement. Pursuant to this agreement, Bio Balance transferred all of its assets to Transaction LLC, a transaction that necessarily required the approval of the directors of Bio Balance. *See* 8 *Del. C.* § 271(a). The claim is directed against the Director Defendants in their capacities as corporate directors and falls within the ambit of the consent-to-jurisdiction statute. *See generally* Wolfe & Pittenger, *supra*, § 3.05[a][2], at 3–54 to –57. The Delaware Supreme Court has explicitly approved of the exercise of personal jurisdiction over subsidiary directors pursuant to Section 3114 in a double derivative action. *See Sternberg v. O'Neil*, 550 A.2d 1105, 1127 (Del.1988).

Delaware precedent has regarded the parent corporation as an equally indispensable party in a double derivative suit. The rule derives from a Court of Chancery decision that merely stated, without analysis, that the two corporations "for whose benefit this action is brought[ ] are indispensable parties." *Levine v. Milton*, 219 A.2d 145, 145–46 (Del.Ch.1966). The decision cited only authorities addressing standard derivative actions and noted that the "general rule does not seem to be disputed by plaintiff." *Id.*

 Subsequent Delaware cases have followed *Levine* without giving meaningful consideration to the issue. *See Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1996 WL 189435, at *8 (Del.Ch. Apr. 16, 1996); *Sternberg*, 550 A.2d at 1124. *Sternberg* cited *Levine* and remarked that "[t]he parent corporation is an indispensable party in a double derivative suit against a subsidiary because any recovery for losses suffered by the subsidiary that were being sued upon would go to the parent." 550 A.2d at 1124. This statement conflicts with the foundational understanding of the derivative action as one in which the corporation has been injured and the relief flows to the corporation. So

fundamental are these points that the test of whether an action is derivative or direct turns on "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.2004). If the remedy flows to the injured subsidiary, then personal jurisdiction over the parent is not necessary to grant relief.

■■■ Nor is jurisdiction over a parent corporation and its directors necessary to analyze demand futility. That issue is addressed on the pleadings, does not allow for discovery against the parent, and does not result in any relief against the parent entity or its directors. The ruling establishes only that the plaintiff can proceed on behalf of the entity owning the derivative claim over which the Court necessarily will have jurisdiction.

Conversely, requiring personal jurisdiction over both entities risks situations in which there will be no forum available to hear the suit. *See Sternberg*, 550 A.2d at 1124–25. Parties seeking to avoid legal oversight may design their corporate structures with that precise goal in mind. Adherence to the traditional view forced the Delaware Supreme Court in *Sternberg* to reverse the Court of Chancery and assert personal jurisdiction over an Ohio parent corporation based on its thirty-year ownership of a Delaware subsidiary, a result that Chancellor Allen later regarded, if read literally, as a principle of "startling breadth." *Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1992 WL 171420, at *5 (Del.Ch. July 17, 1992). It was therefore

> especially important in interpreting the precedential impact of *Sternberg,* to recognize that the foreign corporation was

not held to be subject to jurisdiction in a suit in which it might be required to pay any judgment. The directors of GenCorp who did run a risk of liability were dismissed. GenCorp was indispensable simply as RKO's stockholder as a technical matter of existing law. It faced no potential liability.

*Id.* In other words, the Ohio parent readily could have been left out of the suit but for allegiance to *Levine.*

■■■ So long as a court has jurisdiction over the entity actually owning the claim being asserted derivatively, the question of whether a related corporation is an indispensable party to a derivative, double derivative, or multi-derivative action should not be answered by rote adherence to a bright-line rule of dubious origin. It should rather turn on the facts of the case and the standards set forth in Court of Chancery Rule 19(b). *See In re Sunstates Corp. S'holder Litig.,* 2001 WL 432447, at *2 (Del.Ch. Apr. 18, 2001). Here, personal jurisdiction over NYHC is not required to determine whether Hamilton Partners can litigate Bio Balance's claim, nor for purposes of granting relief to Bio Balance. Regardless, to the extent it were required, the act of forming Transaction LLC renders NYHC subject to personal jurisdiction for the specific purpose of a challenge to the Second Settlement. This Court therefore has personal jurisdiction over all of the parties necessary to adjudicate the Bio Balance double derivative claim.

## C. Personal Jurisdiction For The NYHC Derivative Action

■■ The Director Defendants separately contend that the NYHC derivative action should be dismissed for lack of personal jurisdiction over the necessary parties. Because the Complaint asserts that the Director Defendants breached fiducia-

ry duties owed to NYHC and its stockholders, personal jurisdiction must exist over those individuals in their capacities as directors of NYHC. Delaware's director consent statute applies only to "a corporation organized under the laws of this State." 10 *Del. C.* § 3114(a). It has no purchase on directors of a New York corporation.

■ As with Grossman, Hamilton Partners turns to Section 3104(c)(1) and relies on the formation of Transaction LLC as the basis for Delaware jurisdiction. Through its corporate counsel, NYHC caused the formation of Transaction LLC. This act subjects NYHC to personal jurisdiction in this Court. But Hamilton Partners has not explained how that jurisdiction-conferring act can be attributed to the Director Defendants. "[A] corporate director or officer of a foreign corporation cannot be haled into a Delaware court for an act of the corporation simply because the officer or director has directed the corporation to take that act.... Rather, the corporate officer or director must be shown to have substantial contacts in Delaware or with a nexus to Delaware having a clear relationship to the cause of action." *Ruggiero v. FuturaGene, PLC,* 948 A.2d 1124, 1134 (Del.Ch.2008). The Director Defendants have no ties to Delaware other than their status as directors of the Delaware subsidiary, a status that is irrelevant to a claim against them as directors of the New York parent. Because this Court lacks personal jurisdiction over the Director Defendants in their capacities as directors of NYHC, the standard derivative claim on behalf of NYHC is dismissed.

## D. Demand Futility

■ Traditionally under *Rales v. Blasband,* 634 A.2d 927 (Del.1993), a stockholder plaintiff only could proceed with a double derivative claim without making demand if the complaint properly pled demand futility at both the parent and subsidiary level. *Rales* involved a double derivative action brought on behalf of Easco Hand Tools, Inc. ("Easco"), a wholly owned subsidiary of Danaher Corporation, by a stockholder of Danaher, Easco's publicly traded parent. *Id.* at 930. The United States District Court for the District of Delaware certified to the Delaware Supreme Court the question of the legal standard that would govern the question of demand futility at the Danaher board level. *Id.* It was the Easco directors, rather than the Danaher directors, who approved the underlying transaction challenged in the derivative action, and "[t]he absence of board action [made] it impossible to perform the essential inquiry contemplated by *Aronson*—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction." *Id.* at 933 (citing *Aronson v. Lewis,* 473 A.2d 805, 813 (Del. 1984)). The Delaware Supreme Court therefore crafted a new and more generalized standard for judging the Danaher directors' ability to consider a demand:

> whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations. Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile.

*Id.* at 934.

Having answered the certified question by announcing the *Rales* test, the Dela-

**1202**

ware Supreme Court went on to hold that "[a] plaintiff in a double derivative suit is still required to satisfy the *Aronson* test in order to establish that demand on the subsidiary's board is futile." *Id.* The Supreme Court then applied the *Rales* test at the parent level and found demand futile. *Id.* at 935–37. In doing so, the Supreme Court held that the three members of the Danaher board who also were members of the Easco board had "a disqualifying financial interest that disables them from impartially considering a response to a demand." *Id.* at 936. Implicitly, demand was futile for the Easco board as well, but the Supreme Court noticeably did not conduct a subsidiary level analysis.

In its recent *Lambrecht* decision, the Delaware Supreme Court embraced a different approach to double derivative actions involving wholly owned subsidiaries in which demand futility need only be shown at the parent level. The traditional requirement to show demand futility at both the parent and subsidiary levels rested on corporate separateness and board-centrism. A corporate claim that can be asserted derivatively by a stockholder constitutes an asset of the corporation and falls under the direction and control of the board of directors of the corporation owning the claim.[8] Because a derivative action impinges on the managerial freedom of directors, a stockholder plaintiff only can assert a claim derivatively if the plaintiff satisfies Rule 23.1 and the other common law and statutory criteria for a derivative action, including the contemporaneous and continuous ownership requirements.[9] It followed that all derivative action criteria had to be met at both levels, an inference reinforced by *Rales'* seeming insistence on double demand futility and *Levine's* conclusory holding that both entities were indispensable parties. The concept of the double derivative action as two suits in one likewise flowed from the model of a standard derivative action as two suits in one: "First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it."[10] The Delaware Supreme

8. *See* 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."); 8 *Del. C.* § 122 ("Every corporation created under this chapter shall have power to ... [s]ue and be sued in all courts and participate, as a party or otherwise, in any judicial, administrative, arbitrative or other proceeding, in its corporate name."); *Lewis v. Anderson*, 477 A.2d 1040, 1044 (Del.1984) ("[T]here is no disagreement, and can be none, that plaintiff's derivative claim against the individual defendants of Old Conoco was a property right of Old Conoco."); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del.1981) ("Directors of Delaware corporations derive their managerial decision making power, which encompasses decisions whether to initiate, or refrain from entering, litigation, from 8 *Del. C.* § 141(a).").

9. *See* 8 *Del. C.* § 327; *Aronson*, 473 A.2d at 811–12 ("By its very nature the derivative action impinges on the managerial freedom of directors. Hence, the demand requirement of Chancery Rule 23.1 exists at the threshold, first to [e]nsure that a stockholder exhausts his intracorporate remedies, and then to provide a safeguard against strike suits." (internal footnotes omitted)); *accord Pogostin v. Rice*, 480 A.2d 619, 624 (Del.1984) ("However, because the derivative action impinges on the managerial freedom of directors, the law imposes certain prerequisites to the exercise of this remedy. Thus, the requirement of Chancery Court Rule 23.1 exists at the threshold to prevent abuse and to promote intracorporate dispute resolution.").

10. *Aronson*, 473 A.2d at 811; *accord Schoon v. Smith*, 953 A.2d 196, 201–02 (Del.2008) (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990) (quoting *Aron-*

Court's ruling in *Lewis v. Anderson*, 477 A.2d 1040 (Del.1984), to the effect that a stockholder plaintiff loses standing to sue derivatively as a result of a triangular merger, appeared to confirm this view. That harsh and mechanistic rule was said to rest on "the separate corporate existence and identity of [the two] corporate entities, as well as the statutory mandate that the management of every corporation is vested in its board of directors, not in its stockholders." *Lewis v. Ward*, 852 A.2d 896, 903 (Del.2004).

In *Lambrecht*, the Delaware Supreme Court rejected the "two derivative lawsuits in one" model as "conceptually flawed" and inconsistent with Delaware law. 3 A.3d at 287–88. Taking a realistic and practical view of the relationship between parent and wholly owned subsidiary, the Supreme Court held that for such a subsidiary, a double derivative claim "[n]ormally ... is one that only the parent corporation, acting through its board of directors, is empowered to enforce." *Id.* at 282. The Supreme Court further observed that where a wholly owned subsidiary is concerned, a parent corporation "is not required to proceed derivatively; it may enforce that claim by the direct exercise of its 100 percent control." *Id.* at 288. Citing *Lewis v. Anderson*, Supreme Court held that in a triangular merger, the acquired corporation's claims become the property of the parent "as a matter of statutory law." *Id.*

A corporate technician would object to these statements, and if read literally, they conflict with Sections 122, 141(a), and 259 of the Delaware General Corporation Law, (the "DGCL"). The corporate right of action at issue in *Lambrecht* originally belonged to and was asserted derivatively on behalf of Merrill Lynch. 3 A.3d at 279. Bank of America Corporation ("BofA") subsequently acquired Merrill Lynch in a reverse triangular merger in which Merrill Lynch merged with a wholly owned acquisition subsidiary of BofA and the former stockholders of Merrill Lynch received shares of BofA common stock. In this transaction structure, by operation of Section 259, a cause of action owned pre-merger by Merrill Lynch continues to be owned *at the subsidiary level* by the combined entity post-merger.[11] Post-merger,

---

*son* for the "two-fold" nature of the derivative action); *Sternberg*, 550 A.2d at 1124 n. 41 ("The normal derivative suit was 'two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation.' " (quoting Robert Clark, *Corporate Law* 639–40 (1986))); *Zapata*, 430 A.2d at 784 (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit").

11. 8 *Del. C.* § 259(a); *Lewis v. Anderson*, 477 A.2d at 1044 ("Nor is there any dispute that upon Old Conoco's merger into Du Pont Holdings, Old Conoco's assets and liabilities, *in general*, passed under § 259(a) to, and became vested in, the surviving corporation, Du Pont Holdings or New Conoco. It would also

seem clear under § 259(a) that plaintiff's derivative claim constituted a chose in action which became 'vested' in New Conoco."). Section 259(a) provides:

(a) When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature ... of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property,

only the board of directors *of the subsidiary* has statutory authority over the derivative claim. 8 *Del. C.* § 141(a).

*Lewis v. Anderson* addressed precisely this point. DuPont acquired Conoco in a reverse triangular merger in which Conoco merged with New Conoco, a wholly owned subsidiary of DuPont, and the former stockholders of Conoco received DuPont common stock. Addressing the effects of this structure on the pending derivative claim, the Supreme Court stated:

Section 259(a) plainly vests *in New Conoco* the right to determine the disposition of plaintiff's suit. Clearly, *New Conoco*, as the acquiring corporation, through its Board of Directors, has exclusive control over its own affairs, including the disposition of all choses in action and pending claims passing by reason of the merger. This basic principle of Delaware Corporation Law is explicitly recognized in 8 *Del. C.* § 141(a), Court of Chancery Rule 23.1 and *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779 (1981).

*Lewis v. Anderson,* 477 A.2d at 1050 n. 19 (emphasis added). To repeat, New Conoco was the wholly owned subsidiary, not the parent corporation.

In light of this holding and the operation of Section 259, it is inaccurate to cite a "legal precept, confirmed in *Lewis v. Anderson* and its progeny, that as a result of the merger, Merrill Lynch's claim becomes the property of BofA as a matter of statutory law." *Lambrecht,* 3 A.3d at 288. *Lewis v. Anderson* held that the claim of the acquired corporation becomes the property of the post-merger subsidiary, as

Section 259 provides, not the property of the parent corporation.

■ The hypothetical offered by *Lambrecht* in support of its legal precept illustrates a critical distinction between a triangular merger and a direct merger.

[S]uppose (hypothetically) that the merger is structured as a two party transaction in which Merrill Lynch disappears and the surviving corporation is BofA. In that case, because Merrill Lynch would no longer exist, BofA could not—and would not be required to—sue derivatively on Merrill Lynch's behalf. As sole owner of the (former) Merrill Lynch claim, BofA could sue directly and in its own name.

*Id.* at 288. This is precisely correct. In a direct, two-party merger, Section 259 provides that the resulting corporation possesses "all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well . . . as all other things in action." 8 *Del. C.* § 259(a). But the *Lambrecht* decision then states:

No different result should obtain where, as here, the merger is structured as a three party transaction with Merrill Lynch ending up as BofA's wholly owned subsidiary. Because BofA owns 100 percent of the shares of its (post-merger) Merrill Lynch subsidiary, there is no basis in law or logic to treat BofA as if it were a minority shareholder of Merrill Lynch and require it to sue de-

real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolida-

tion; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations. . . .
8 *Del. C.* § 259(a).

rivatively to enforce Merrill Lynch's pre-merger claim.

3 A.3d at 288–89. As a statutory matter, this is precisely incorrect. In a triangular merger, the parent corporation is not the surviving or resulting corporation for purposes of Section 259(a). The parent corporation is rather the source of

> the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares ..., which cash, property, rights or securities of any other corporation or entity may be in addition to or in lieu of shares or other securities of the surviving or resulting corporation.

8 *Del. C.* § 251(b). The parent corporation does not receive the right to sue as a result of the merger and cannot assert directly the right of the subsidiary.

■■■ To kvetch about the technical statutory analysis, however, is to ignore the pragmatic and equitable nature of the *Lambrecht* ruling. Deeper examination of the opinion makes clear that the *Lambrecht* Court took a realistic and practical approach to the double derivative action. Such a re-visioning of an equitable cause of action falls within the Delaware Supreme Court's power to extend the principles of equity to address new circumstances. *See Schoon,* 953 A.2d at 204 ("The judicial creation of equitable standing for a stockholder to bring a derivative action demonstrates that equitable doctrine can be judicially extended to address new circumstances."). "Judicially-created equitable doctrines may be extended so long as the extension is consistent with the principles of equity." *Id.* at 205.

The *Lambrecht* opinion openly rests on the practical ability of the sole stockholder to exercise control over the subsidiary. After setting out its hypothetical, the *Lambrecht* Court stated in the very next sentence that "BofA's sole ownership, alone and without more, empowers and entitles BofA, acting through its own board of directors or authorized officers, to use its direct control to cause its wholly owned subsidiary, Merrill Lynch, *to do what is necessary to enforce Merrill Lynch's pre-merger claim.*"[12] The phrase "to do what is necessary" shows that the Delaware Supreme Court was not focused on the formality of which entity owned the claim, but rather on the reality that a parent can readily cause its wholly owned subsidiary to sue. The *Lewis v. Anderson* Court similarly recognized the real-world ability of DuPont as parent corporation to cause its wholly owned subsidiary to sue. In rejecting the plaintiff's argument that no one post-merger had standing to pursue Old Conoco's claims, the Delaware Supreme Court made clear that DuPont could allow (or cause) New Conoco to sue directly: "If New Conoco were to proceed against Old Conoco's former management and obtain a recovery, ... New Conoco would be simply pursuing Old Conoco's assets and minimizing its liabilities. All such assets and liabilities clearly passed by virtue of the merger under § 259 to New Conoco." 477 A.2d at 1050–51; *accord Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.,* 906 A.2d 168, 202 (Del.Ch. 2006) ("In the usual course, Trenwick, as sole owner, could exercise its control over

---

**12.** 3 A.3d at 289 (emphasis added). Other statements in the *Lambrecht* opinion likewise focus on the parent's practical authority. *See id.* at 288 ("As the sole owner of Merrill Lynch, BofA is not required to proceed derivatively [like a minority stockholder]; it may enforce that claim by the direct exercise of its 100 percent control."); *id.* at 289 n. 40 ("Merrill Lynch's corporate separateness would not be diminished by action taken by its sole owner directing Merrill Lynch's managers to file a lawsuit.").

Trenwick America to press any derivative claims.").[13]

The Delaware Supreme Court's decision in *Lambrecht* to permit a plaintiff to proceed with a double derivative action post-merger should be regarded as a resoundingly pro-stockholder ruling that is consistent with Delaware public policy. Under *Lewis v. Anderson*, a triangular merger universally extinguished stockholder standing to pursue derivative claims, regardless of their underlying merit. "If derivative actions promote firm value, even marginally, then a rule that forecloses some number of both meritorious and meritless derivative actions will, all things being equal, inherently transfer some degree of wealth from corporations to the individuals who commit corporate wrongs." J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673, 691 (2008) (arguing for statutory amendment to 8 *Del. C.* § 327). The resulting wealth transfer confers a windfall on faithless fiduciaries and creates perverse incentives for misbehavior. *See id.* At the same time, the risk that a plaintiff would invest resources in a viable claim only to lose standing through a merger dis-incentivizes stockholders from engaging in monitoring under circumstances where it is already "likely that in a public corporation there will be less shareholder monitoring expenditures than would be optimum from the point of [view of] the

shareholders as a collectivity." *Bird v. Lida, Inc.*, 681 A.2d 399, 403 (Del.Ch. 1996). For these and other reasons, Chancellor Chandler criticized the *Lewis v. Anderson* rule, but he also cautioned that "if this area of Delaware law is to be made consistent with basic economic principles, as well as fundamental principles of equity and fairness, it will have to come from the Delaware Supreme Court." *Ash v. McCall*, 2000 WL 1370341, at *13 n. 47 (Del.Ch. Sept. 15, 2000). *Lambrecht* remedies much of the inequity resulting from the standing-based extinction of all stockholder derivative actions that resulted from strict adherence to the legalistic approach taken in *Lewis v. Anderson*. It is important to recognize and not gloss over the technical missteps in *Lambrecht*'s formal statutory analysis lest they be used to call into question the inherently equitable approach taken by the Delaware Supreme Court.

■ The pragmatic view of the double derivative action adopted in *Lambrecht* has significant implications for pleading demand futility in a double derivative action. Because the parent corporation determines, through its 100 percent control, whether or not the subsidiary will sue, "there is no basis in law or logic" to require a separate demand futility analysis at the subsidiary level. 3 A.3d at 288–89. To do so would treat the parent corporation as "if it were a minority shareholder"

---

**13.** Creative minds might conjure visions of brave wholly owned subsidiary directors fighting a rearguard action against the sole stockholder, empowered temporarily until the next annual meeting (if the subsidiary charter eliminates the parent's right to act by written consent) or for the balance of what is now understood to be a term of something more than twenty-eight months (if the subsidiary has an effective classified board). *See Airgas, Inc. v. Air Prods. and Chems., Inc.*, 8 A.3d 1182, 1193–95 (Del.2010) (interpreting customary classified board provision as prevent-

ing stockholders from advancing annual meeting to occur eight months earlier in the third year of the classified directors' term, but declining to specify the degree of permissible meeting advancement or standard for assessing it). These are not real world scenarios, but rather hypotheticals "at best fit for a discussion by a Red Bull fueled group of nerdy second year law school corporate law junkies, who find themselves dateless (big surprise) on yet another Saturday night." *Yucaipa Am. Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310, 343 (Del.Ch.2010).

that only could proceed on behalf of its subsidiary by establishing demand futility, when in reality the parent corporation simply directs its subsidiary to file suit. *Id.* For this reason, the *Lambrecht* Court repeatedly observed that in a double derivative action involving a wholly owned subsidiary, a stockholder plaintiff only must plead demand futility (or otherwise satisfy Rule 23.1) at the parent level.[14]

■ Post-*Lambrecht*, a plaintiff in a double derivative action brought on behalf of a wholly owned subsidiary need only show demand futility or otherwise satisfy Rule 23.1 at the parent level. If, as here, the parent entity is not a Delaware corporation, then under the internal affairs doctrine, the law of the state of incorporation determines the showing that a plaintiff must make. *See Sternberg,* 550 A.2d at 1123 (holding that where double derivative action involved Ohio parent corporation, Ohio law controlled demand futility at parent level). NYHC is a New York corporation, and therefore New York law controls.

■ Whether a stockholder of a New York corporation can sue derivatively depends on compliance with Section 626 of the New York Business Corporation Law (the "NYBCL"), N.Y. Bus. Corp. Law § 626(c) (McKinney 2010). It requires that "the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of [the subject] action by the board or the reasons for not making such effort." NYBCL § 626(c). New York decisional law recognizes three situations when demand is excused as futile:

> [A] demand would be futile if a complaint alleges with particularity that (1) a majority of the directors are interested in the transaction, or (2) the directors failed to inform themselves to a degree reasonably necessary about the transaction, or (3) the directors failed to exercise their business judgment in approving the transaction.

*Marx v. Akers,* 88 N.Y.2d 189, 198, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (N.Y.1996). "Director interest may either be self-interest in the transaction at issue, or a loss of independence because a director with no direct interest in a transaction is 'controlled' by a self-interested director." *Id.* at 200, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (internal citation omitted).

The Complaint alleges that demand is excused because (a) a majority of the directors are interested in the Second Settlement and in the outcome of this action, and (b) the Second Settlement is "so egregious

---

14. *See id.* at 282 ("Cases may arise, however, where *the parent corporation's board* is shown to be incapable of making an impartial business judgment regarding whether to assert the subsidiary's claim. In those cases a shareholder of the parent will be permitted to enforce that claim on the parent corporation's behalf, that is, double derivatively." (emphasis added)); *id.* ("In those cases, only the parent corporation owns the subsidiary's stock at the time of the alleged wrongdoing, and the plaintiff owns stock only in the parent. Therefore, a Rule 23.1 demand could only be made—and a derivative action could only be brought—at the parent, not the subsidiary, level."); *id.* at 289 n. 40 (explaining that to proceed, "the plaintiffs must show that a demand on BofA's board would be futile, *i.e.,* that BofA's board is incapable of making an impartial business judgment as to whether or not to enforce Merrill Lynch's pre-merger claim"); *id.* (retorting that "Merrill Lynch's corporate separateness would not be diminished by action taken by its sole owner directing Merrill Lynch's managers to file a lawsuit"); *id.* at 290 (finding no risk of abuse from allowing the double derivative claim because "the double derivative suit cannot go forward except in the unusual case where the parent company board is shown to be incapable of deciding impartially whether or not to enforce the claim that the parent company now (indirectly) owns"); *but see id.* at 286 n. 31 (noting without comment that *Rales* required a showing of demand futility at the subsidiary level).

on its face that it could not have been the product of sound business judgment." Compl. ¶¶ 61, 63. The defendants respond that a majority of the directors are disinterested because no directors are receiving "a direct financial benefit" from the Second Settlement and because they are not controlled by a self-interested director. Defs.' Opening Br. at 24–26.

It is true that no Director Defendant is receiving a direct financial benefit, but this is not determinative. Demand can be rendered futile if a majority of the board is not independent. Setting aside Hacohen for the sake of argument, the Complaint adequately alleges that Berg and Englard are dominated and controlled by Grossman. The Complaint alleges that both men have repeatedly invested with Grossman in the past and expect to do so in the future. *See* Compl. ¶¶ 51–59. The allegations are particularized and specific, and they support a reasonable inference that Berg and Englard were unable to make an impartial decision about whether to approve the Second Settlement. Demand is therefore excused as futile.

In the face of these allegations, the defendants invoke extreme literalism devoid of substance. They find outcome-determinative significance in the New York Court of Appeals' inclusion of the word "director" in the sentence, "Director interest may . . . be . . . a loss of independence because a director with no direct interest in a transaction is 'controlled' by a self-interested *director*." 88 N.Y.2d at 200, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (emphasis added). According to the defendants, *Marx* holds that no one other than a "self-interested director" can have independence-compromising influence on other directors.

This is nonsense. Beyond the inclusion of the word "director," the defendants provide no rational basis for deeming a fiduciary interested if under the influence of or beholden to a *director* who stands on the other side of a deal, but not if under the influence of or beholden to a *non-director* who stands on the other side of the deal. Nothing in *Marx* suggests that the New York Court of Appeals intended to establish such a counter-intuitive, arbitrary, and irrational distinction. To the contrary, at least one New York decision excused demand where the board was "dominated by the prime defendant . . . and his associates," who were not directors. *See Harris v. Averick*, 24 Misc.2d 1041, 204 N.Y.S.2d 369, 371 (N.Y.Sup.Ct.1960); *see also Leffert v. Marcus*, 12 Misc.2d 1097, 174 N.Y.S.2d 546, 547 (N.Y.Sup.Ct.1958), *rev'd on other grounds*, 7 A.D.2d 989, 183 N.Y.S.2d 886 (1959). The relevant inquiry for demand futility is whether a majority of the board "is dominated or otherwise controlled by an individual or entity interested in the transaction at issue," regardless of whether or not the source of the independence-compromising influence is another director. *Higgins v. New York Stock Exch., Inc.*, 10 Misc.3d 257, 806 N.Y.S.2d 339, 357 (N.Y.Sup.Ct. 2005).

### E. Failure To State A Claim On Which Relief Can Be Granted

The Director Defendants next contend that the Complaint does not state a claim against them in their capacities as directors of Bio Balance because, when they approved the Second Settlement, they were following the business plan of their corporate parent. This argument has superficial appeal. The fiduciary duties owed by directors of a wholly owned subsidiaries run only to the parent. *Trenwick*, 906 A.2d at 200. Consequently, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the

subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del.1988). The problem for the Director Defendants is that they did not act in the best interest of NYHC and its stockholders, but rather (as alleged) in the best interests of Grossman. This states a claim. *See Grace Bros., Ltd. v. Uniholding Corp.*, 2000 WL 982401, at *13 (Del.Ch. July 12, 2000) (rejecting argument that "a director of a parent board ... has no duty to stop himself from injuring the parent while wearing his subsidiary hat" on grounds that such a rule "so obviously invites abuse and ... would gut the duty of loyalty owed by Delaware directors to their stockholders").

In *Trenwick*, a litigation trust sued on behalf of the creditors of Trenwick America, a wholly owned subsidiary that had taken on significant debt. The trust alleged that the directors of the subsidiary, all of whom were senior officers of the parent corporation, breached their duty of loyalty by providing guarantees for parent-level debt, making asset transfers for the benefit of the parent, and otherwise acting in the parent's best interest at the expense of the subsidiary. 906 A.2d at 200. The trust argued that the subsidiary was insolvent at the time these steps were taken such that the directors' duties ran to the entity as a whole, not merely to the stockholders, resulting in a conflict of interest. Vice Chancellor Strine dismissed the claim:

> [T]he complaint fails to plead facts supporting a rational inference that Trenwick America was insolvent before any of the challenged transactions or that any of the challenged transactions would, when consummated, leave Trenwick America unable to satisfy its creditors. As a result, the Litigation Trust cannot base a claim on the idea that the Trenwick America directors owed fiduciary obligations to Trenwick America's creditors at the time of the challenged transactions. Because the complaint fails to support an inference of insolvency, the Trenwick America directors were free to manage Trenwick America for the best interests of Trenwick, and to follow loyally the direction of Trenwick's board as to what Trenwick's best interests were. The reality that the parent's strategy ultimately turned out poorly for itself and its subsidiaries does not buttress a claim by the subsidiary that the subsidiary's directors acted culpably by implementing the parent's prior wishes.

*Id.* at 202. Without a credible allegation of insolvency, the subsidiary directors did not face any conflict of interest, and the complaint did not otherwise plead any grounds for a loyalty breach. *Id.*

Because the subsidiary directors lacked any conflict of interest and had every reason to act loyally to the parent, Vice Chancellor Strine held that additional pled facts would be required to state a claim for breach of fiduciary duty:

> [T]he complaint is entirely devoid of pled facts regarding what the Trenwick America board did that was either a breach of the duty of care or the duty of loyalty. In the former respect, I take it as no novelty for me to hold that the Trenwick America board had no duty to replicate the deliberative process of its sole stockholder's board of directors. In the absence of any indication that they would be causing Trenwick America to violate legal obligations owed to others, the Trenwick America board was free to take action in aid of its parent's business strategy. There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration processes, thereby setting in motion an inefficient

intergenerational *Van Gorkom*-machine.... Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another.

Rather, the law is that the Trenwick America directors were obligated to manage Trenwick America with loyalty to Trenwick, the company's sole stockholder. To the extent that the Trenwick America directors acceded to their parent's wishes and lent support to its business strategy, there is no basis to fault them.

That is even so if the Trenwick America board took actions that made Trenwick America less valuable as an entity. If the Trenwick America board authorized the subsidiary to provide (as it appears to have done) guarantees to Trenwick's creditors that supported Trenwick's overall business, they would have been managing the subsidiary to benefit its parent: a proper goal. Such guarantees may reduce the value of the subsidiary conceived as a stand-alone entity but that in itself is of no moment. The payment of a dividend from a subsidiary to a parent does the same thing.... In pondering whether to pay a dividend, however, a subsidiary board is permitted to act to benefit its parent, not simply the subsidiary itself, for the obvious reason that wholly-owned subsidiaries are formed by parents to benefit the parents, and not for their own sake.

*Id.* at 201–02 (footnotes omitted).

 *Trenwick* does not establish a rule of law that forecloses breach of loyalty claims against directors of wholly owned subsidiaries. *Trenwick* instead holds that a plaintiff cannot state a claim against the directors of a wholly owned subsidiary merely by alleging that the directors acted in the best interests of the parent and to the detriment of the subsidiary. A parent-level stockholder plaintiff still can plead a duty of loyalty claim against the directors of a wholly owned subsidiary. The plaintiff simply must plead particularized facts indicating how the directors of the wholly owned subsidiary acted in breach of their duty of loyalty.

The Complaint clears that hurdle. Hamilton Partners alleges that the Director Defendants were beholden to Grossman. In structuring and approving the Second Settlement, the Director Defendants placed Grossman's interests ahead of the interests of the corporations they served. The Complaint explains the highly questionable terms of the Second Settlement. It contains detailed allegations about the web of connections between Grossman and the Director Defendants. It recounts the suspicious chain of events that led from the Change of Control Filing to the First Settlement, through its temporary tactical abandonment, and ultimately to the even more troubling Second Settlement. There is also the attempted Enterologics Transaction. Taken as a whole, the Complaint pleads a strong claim for breach of the duty of loyalty.

 The Director Defendants also argue that the Complaint should be dismissed because of an exculpatory provision in NYHC's certificate of incorporation. *See* NYHC Certificate of Incorporation, art. 3, § 6(b). The provision was an alternative basis for the dismissal of the earlier *Glatzer* litigation. *See Glatzer v. Grossman*, 47 A.D.3d 676, 849 N.Y.S.2d 300 (2008). It has no effect on the Bio Balance claim for two reasons. First, the NYHC charter provision applies only to protect the Director Defendants in their capacities as directors of NYHC. It does not protect

the defendants in their capacities as directors of Bio Balance. Second, it does not protect the Director Defendants against a loyalty claim. *See* NYBCL § 402(b)(1); *In re Metro. Life Deriv. Litig.*, 935 F.Supp. 286, 293 (S.D.N.Y.1996) (observing that a § 402(b) provision "allows monetary recovery against directors ... in limited circumstances, such as improper personal financial gain, bad faith, or intentional misconduct"). As already discussed, I reject the Director Defendants' hyper-literal interpretation of *Marx* to the effect that a claim for breach of the duty of loyalty only can exist when a director receives a direct personal financial benefit from the transaction. Defs.' Opening Br. at 30. Under New York law, "interest is not merely limited to financial interest." *Higgins*, 806 N.Y.S.2d at 357; *see Marx*, 88 N.Y.2d at 200, 644 N.Y.S.2d 121, 666 N.E.2d 1034 (a director can be deemed interested in a transaction if he is controlled by another who is interested in the transaction). Because the defendants' contention fails under New York law, I need not expound upon the obvious additional points that (i) Delaware law governs the loyalty claim at the Bio Balance level,[15] and (ii) Delaware resoundingly rejects the Director Defendants' interest-only position.[16]

■ Finally, Grossman argues that he should be dismissed from the case because New York law does not recognize a tort of civil conspiracy. This position can be rejected on its own terms as another strained misreading of New York precedent. Like Delaware, "New York does not recognize civil conspiracy to commit a tort as an independent cause of action." *Pappas v. Passias*, 271 A.D.2d 420, 707 N.Y.S.2d 178, 180 (2000). This does not mean civil conspiracy is not a cause of action under New York law. Rather, just as in Delaware, the "claim stands or falls with the underlying tort." *Salvatore v. Kumar*, 45 A.D.3d 560, 845 N.Y.S.2d 384, 388 (2007); *accord Empire Fin. Servs., Inc. v. Bank of New York (Del.)*, 900 A.2d 92, 98–99 (Del.2006). The underlying tort (albeit an equitable tort) is breach of fiduciary duty.

■ Moreover, the conspiracy count against Grossman is properly construed as a claim for aiding and abetting the Director Defendants' breach of fiduciary duty. *See Allied Capital*, 910 A.2d at 1038–39. The claim for breach of fiduciary duty over which this Court has jurisdiction is the double derivative claim asserted on behalf of Bio Balance. Under the internal affairs doctrine, Delaware law governs that claim, and Delaware law therefore also

---

15. *See Rogers v. Guaranty Trust Co.*, 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 652 (1933) ("[I]n respect of its internal affairs, [a] company [is] to be governed by the laws of the state in which it was organized."); *Draper v. Paul N. Gardner Defined Plan Trust*, 625 A.2d 859, 867 (Del.1993) (same).

16. *E.g.*, *In re Emerging Commc'ns, Inc. S'holder Litig.*, 2004 WL 1305745, at *38–39 (Del.Ch. June 4, 2004) (denying exculpation under § 102(b)(7) charter provision where director Raynor "did not personally and directly benefit from the unfair transaction ... but ... actively assisted [controlling shareholder] Prosser in carrying out the Privatization, and ... acted to further Prosser's interest in that

transaction, which were antithetical to the interests of ... minority stockholders"); *see generally Venhill Ltd. P'ship ex rel. Stallkamp v. Hillman*, 2008 WL 2270488, at *1 (Del.Ch. June 3, 2008) ("[I]t is not only greed that can inspire disloyal behavior by a business fiduciary."); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del.Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation.").

governs the aiding and abetting claim predicated on the underlying fiduciary breach. *See Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *19 (Del.Ch. July 26, 2010); *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 822 (Del.Ch.2009). At this point in the opinion, it suffices to say that Delaware recognizes a claim for aiding and abetting a breach of fiduciary duty, which the Complaint adequately pleads.

## F. Forum Non Conveniens

 The defendants last argue that the Complaint should be dismissed under the doctrine of *forum non conveniens.* "The United States is a federal republic that depends on comity among the states for the peaceful and efficient conduct … of private commerce." *Third Ave. Trust v. MBIA Ins. Corp.*, 2009 WL 3465985, at *1 (Del.Ch. Oct. 28, 2009). "When a state court with little legitimate interest in a matter purports to speak on a subject of importance to a sister state, the reliability of state law is undermined and a counterproductive incentive is created for all state courts to afford less than ideal respect to each other." *Id.* The doctrine of *forum non conveniens* provides the primary vehi-cle through which courts apply the doctrine of comity.

 Delaware courts analyze *forum non conveniens* issues by balancing the so-called "*Cryo–Maid* factors." *See General Foods Corp. v. Cryo–Maid, Inc.*, 198 A.2d 681, 684 (Del.1964). In paraphrased form, the factors are:

(1) whether the controversy depends upon a question of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;

(2) the relative ease of access to proof;

(3) the availability of compulsory process for witnesses;

(4) the existence of other litigation involving substantially similar parties or subject matter; and

(5) any other matters that would affect the conduct of the litigation and the expeditious and economic administration of justice.

*Id.*; see *Parvin v. Kaufmann*, 236 A.2d 425, 427 (Del.1967) (adding consideration of other litigation involving similar parties or subject matter). I have omitted "the possibility of the view of the premises" because it so rarely has any relevance.[17]

---

**17.** *See, e.g., Petroplast Petrofisa Plasticos S.A. v. Ameron Int'l Corp.*, 2009 WL 3465984, at *4 n. 17 (Del.Ch. Oct. 28, 2009) ("Neither party seriously contends that the third factor, the possibility of viewing the premises, is relevant in this case. Accordingly, that factor is not discussed further."); *Aveta, Inc. v. Colon*, 942 A.2d 603, 610 n. 25 (Del.Ch.2008) ("There are no premises to view in this case and, therefore, I do not address that *Cryo–Maid* factor."); *Rapoport v. Litig. Trust of MDIP Inc.*, 2005 WL 3277911, at *7 (Del.Ch. Nov. 23, 2005) ("The parties have presented no evidence that this factor is relevant."); *Friedman v. Alcatel Alsthom*, 752 A.2d 544, 554 (Del.Ch. 1999) ("This factor is not applicable and is given no weight."); *Asten v. Wangner*, 1997 WL 634330, at *3 (Del.Ch. Oct. 3, 1997) ("A view of the premises is irrelevant."); *GTE Mobilnet Inc. v. Nehalem Cellular, Inc.*, 1994 WL 116194, at *5 (Del.Ch. Mar. 17, 1994) ("This factor is inconsequential in a determination of which forum is more convenient to litigate this action. A view of the premises is neither necessary nor relevant to this dispute and should therefore be given no weight."). Even in a case where there was a relevant "premises" that the fact-finder might want to "view," it still carried minimal weight. *See Pena v. Cooper Tire & Rubber Co.*, 2009 WL 847414, at *6 (Del.Super.Mar. 31, 2009) ("The Court is not persuaded that the fact-finder must or will view the [traffic] accident scene [located in the Mexican state of Chihuahua] in person. If such a view of the scene is desirable or necessary, it can be captured photographically or digitally and then be displayed to the Court or the fact-finder as need-

On those rare occasions when it merits consideration, it can be addressed under the final, catch-all factor.

### 1. Delaware's Interest In The Dispute

 The first *Cryo–Maid* factor is whether Delaware law applies. As the Delaware Supreme Court held in the original *Cryo–Maid* decision, the question is "whether or not the controversy is dependent upon the application of Delaware law *which the courts of this State more properly should decide than those of another jurisdiction.*" 198 A.2d at 684 (emphasis added). Choice of law under *Cryo–Maid* operates as a proxy for Delaware's interests, and the analysis must address the degree to which Delaware has a particular interest in the subject matter of the case. It therefore includes considerations such as the nature and novelty of questions of law to be answered, the desirability of providing a Delaware forum, and the importance of overseeing the conduct of particular classes of actors and policing against particular types of wrongdoing.

 The double derivative action on behalf of Bio Balance involves the internal affairs of a Delaware corporation, an area where Delaware's interests are paramount. It pleads significant claims for breach of the duty of loyalty against the Bio Balance directors and raises the specter that Delaware entities are being used to further a fraudulent scheme. In asserting jurisdiction over a double derivative action which, like this one, involved a foreign parent and a Delaware subsidiary, the Delaware Supreme Court held that "Delaware has more than an interest in providing a sure forum for shareholder derivative litigation involving the internal affairs of

its domestic corporations. Delaware has an obligation to provide such a forum." *Sternberg,* 550 A.2d at 1125 (internal citations and footnote omitted). Delaware courts have a significant and substantial interest in overseeing the conduct of corporate fiduciaries. *Ryan v. Gifford,* 918 A.2d 341, 349–50 (Del.Ch.2007); *In re Chambers Dev. Co. S'holders Litig.,* 1993 WL 179335, at *3 (Del.Ch. May 20, 1993). Likewise, "Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's legitimacy as a chartering jurisdiction depends on it." *NACCO Indus., Inc. v. Applica, Inc.,* 997 A.2d 1, 26 (Del.Ch.2009). As the United States Supreme Court has recognized, a chartering state has "a substantial interest in preventing the corporate form from becoming a shield for unfair business dealing." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 93, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Given these significant interests, the first *Cryo–Maid* factor militates powerfully in favor of retaining jurisdiction.

### 2. Access To Proof And Compulsory Process

 The second and third *Cryo–Maid* factors do not affect the analysis meaningfully. The second factor, access to proof, could marginally favor a New York forum. NYHC is headquartered in Brooklyn, and Grossman, Berg, and Englard are residents of New York. Necessarily there will be some incremental expense to proceeding in Delaware, but modern means of communication and transportation minimize it. Generally speaking, absent extraordinary circumstances, this *Cryo–Maid* factor has become largely insignifi-

---

ed. This factor does not predominate in favor of defendants." (internal quotation marks and

footnotes omitted)).

cant for corporate and commercial disputes.[18] It continues to have salience for disputes involving parties with limited resources. *See, e.g., Aveta,* 942 A.2d at 612–13 (dismissing suit against individual from Puerto Rico on *forum non conveniens* grounds in part because of "substantial issues of fairness, and considering the relative size and resources of the defendant in this case").

 The availability of compulsory process for witnesses does not weigh against Delaware. The principal witnesses will be the Director Defendants and Grossman, over whom this Court has jurisdiction. In addition, through its jurisdiction over NYHC and Bio Balance, this Court can compel production of (i) documents in the entities' possession, custody, or control, (ii) corporate representatives pursuant to Rule 30(b)(6), and (iii) officers, directors, and managing agents of the firms pursuant to Rule 30(a). *See generally* 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2107 (3d ed. 1998 & Supp. 2010) ("A [third party] subpoena is not necessary if the person to be examined [by deposition] is a party or an officer, director, or a managing agent of the party."); *accord* Daniel R. Coquillette et al., *Moore's Federal Practice—Civil* § 30.03 (3d ed. 1997 & Supp.2010). This Court has

the authority to order a defendant corporation to produce a particular officer, director, or managing agent for deposition in a particular location. *See Dalton v. Am. Inv. Co.,* 1981 WL 7619, at *1 (Del.Ch. June 9, 1981) (noting Court's discretionary authority to order deposition at a particular location); *Lasher v. Sterwin Labs.,* 1980 WL 10017, at *1–2 (Del.Ch. Jan. 28, 1980) (ordering defendant corporations to produce witness for deposition in Delaware). The Court can impose sanctions on the party-corporation if an officer, director, or managing agent fails to attend a deposition. *See* Ch. Ct. R. 37(b)(2); *accord* Fed.R.Civ.P. 37(d) advisory committee's note ("The failure of an officer or managing agent of a party to make discovery as required by present Rule 37(d) is treated as the failure of the party."). Deposition testimony given by an officer, director, or managing agent of a corporate party can be used against the entity at trial. *See* Ch. Ct. R. 32(a)(2).

 Through its jurisdiction over NYHC and Bio Balance, this Court similarly can compel the appearance at trial of directors, officers, and managing agents of the corporate entities. This Court has undisputed authority to compel a named defendant, over whom the Court has personal jurisdiction, to appear at trial. 10

---

18. *See, e.g., Vichi v. Koninklijke Philips Elecs. N.V.,* 2009 WL 4345724, at *13 (Del.Ch. Dec. 1, 2009) (finding the Delaware courts can collect evidence from other jurisdictions, even where most of the relevant documents and witnesses were in Italy and the Netherlands); *Petroplast Petrofisa Plasticos S.A.,* 2009 WL 3465984, at *5 (noting that documents and witnesses were in California, Texas, and South America and observing that " 'collecting evidence from other jurisdictions is regularly handled with ease in this Court.' " (quoting *In re Citigroup S'holder Deriv. Litig.,* 964 A.2d 106, 118 (Del.Ch.2009))); *Rapoport,* 2005 WL 3277911, at *5–6 ("[T]he potential inconvenience of having to transport docu-

ments is slight because, as then Vice Chancellor, now Chief Justice Steele observed, '[m]odern methods of information transfer render concerns about transmission of documents virtually irrelevant.' Similarly, modern methods of transportation lessen the Court's concern about the travel of witnesses ....'" (quoting *Asten,* 1997 WL 634330, at *3)); *In re IBP, Inc.,* 2001 WL 406292, at *9 (Del.Ch. Apr. 18, 2001) ("While it is true that Arkansas will be more convenient for Tyson's witnesses, that is not a substantial factor. Depositions can be scheduled in a manner convenient to witnesses, and business travel is expected of top corporate executives....").

Del. C. § 362; *Kingsbridge Capital Gp. v. Dunkin' Donuts Inc.*, 1989 WL 997175, at *1 (Del.Ch. Sept. 6, 1989). "A corporation is an artificial being created by law.... Being artificial and the mere creature of the law, it can only act by its officers and agents." *Joseph Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas Co.*, 156 A. 350, 351 (Del.Super.1931). The power to compel a corporate defendant to appear at trial would be a hollow one if it meant only that the certificate of incorporation would be placed in the witness box.

■■■ The same jurisdictional authority exercised in connection with the discovery process empowers the Court to issue trial subpoenas to officers, directors, and managing agents of a corporate party. *See Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.*, 1997 WL 716898, at *1 (Del.Super.Aug. 18, 1997) ("It is within the power of this Court to compel the live testimony of a non-resident officer, director, or managing agent of a Delaware corporate [party] which has availed itself

to the jurisdiction of this Court."); *Saxe v. Brady*, 1961 WL 62158, at *1 (Del.Ch. Oct. 20, 1961) (implying that power exists to order trial appearance of non-resident officers and managing agents and exercising discretion not to exercise the authority). The Court of Chancery Rules recognize that a party can call a director, officer, or managing agent of an adverse entity as a trial witness and interrogate the witness with leading questions:

> A party to the record in any action or judicial proceeding may interrogate any unwilling or hostile witness by leading questions. Such party may call ... an officer, director or managing agent of a public or private corporation or of a partnership or association which is an adverse party, and interrogate the witness thus called by leading questions and contradict and impeach the witness in all respects as if the witness had been called by the adverse party....

Ch. Ct. R. 43(b). Federal authorities have reached the same conclusion.[19] As during

**19.** *See Shawnee Hldgs., Inc. v. Travelers Indem. Co.*, 2004 WL 234369, at *1 (M.D.Pa. Feb. 4, 2004) (directing defendant corporations to produce at trial managers who arguably were not amenable to subpoena power as individuals); *United States v. Hitachi Am., Ltd.*, 1996 WL 47157, at *1–2 (Ct. Int'l Trade Feb. 1, 1996) (ordering corporate defendants to produce officers and employees at trial even though they were not United States citizens or residents; explaining, "[T]he Court has not been asked to issue subpoenas. What is sought is that the Court order the corporate defendants, over whom it unquestionably has jurisdiction, to produce certain witnesses."). A majority of federal courts likewise have concluded that subpoena authority pursuant to Rule 45 extends to officers, directors, or managing agents of the respondent corporation irrespective of territorial limits that otherwise would prevent the issuance of a subpoena to the witness. *See, e.g., Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 302 (S.D.N.Y.2009) ("A majority of courts ... have found that Rule 45[ ] permits service of a subpoena on a party

or a party's officer beyond the 100–mile range that otherwise would serve as a bar."); *In re Vioxx Prods. Liab. Litig.*, 438 F.Supp.2d 664, 667 (E.D.La.2006) ("Rule 45(b)(2) empowers the Court with the authority to subpoena Mr. Anstice, an officer of a party, to attend trial beyond the 100 mile limit."); *Am. Fed'n of Gov't Emps. v. Ashcroft*, 354 F.Supp.2d 909, 915 (E.D.Ark.2003) ("The majority of courts ... have held that a court may compel the trial testimony of ... the party's high-level employees or officers even when the person to be compelled resides beyond the 100–mile range for subpoenas."). Admittedly, some federal courts have held otherwise. *See, e.g., Lyman v. St. Jude Med. S.C.*, 580 F.Supp.2d 719, 733 (E.D.Wis.2008) ("[T]he Court disagrees with [the majority] interpretation of the provisions of Rule 45."); *Johnson v. Big Lots Stores, Inc.*, 251 F.R.D. 213, 215–16 (E.D.La.2008) ("A minority of courts have ruled ... that Rule 45(b)(2) defines the scope of a court's subpoena power and the places where a trial subpoena may be properly served."); *JamSports & Entm't, LLC v. Para-*

the discovery process, any consequences for the individual's failure to appear, including sanctions, adverse inferences, or other rulings, falls on the corporation, not the individual whom the corporation was compelled to produce. *See* Ct. Ch. R. 37(d); *cf. El Salto, S.A. Co. v. PSG Co.,* 444 F.2d 477, 484 (9th Cir.1971) (refusing to impose sanctions for the officer's failure to appear for deposition when he was served with notice in his individual capacity).

This Court therefore has the power to issue compulsory process to all likely witnesses, both for discovery and trial. To the extent there is a third party whose testimony is required or who is not under the control of a party for purposes of collecting and producing documents, the commission process·is available. 10 *Del. C.* § 368; *see Brandin v. Deason,* 941 A.2d 1020, 1025–26 (Del.Ch.2007) (finding that commission process and admission of deposition testimony is adequate, such that the unavailability of compulsory process argument "lacks persuasive merit" even 'where "the defendants have identified three groups of witnesses whom they say are not subject to the court's subpoena power"). The ability to exercise jurisdiction over corporate parties together with the availability of the commission process renders this *Cryo–Maid* factor largely insignificant for corporate and commercial cases.[20]

dama Prods., Inc., 2005 WL 14917, at *1 (N.D.Ill. Jan. 3, 2005) (disagreeing with majority view).

A separate line of federal decisions recognizes the jurisdictional authority over representatives of a corporate party when exercising the court's discretionary power to compel a director, officer, or managing agent to appear for deposition in the forum under Rule 26(c)(1)(B). *See Mapes v. Wellington Capital Gp.,* 2008 WL 624471, at *4 (D.Neb. Mar. 4, 2008) (ordering the officer of the corporation to appear for a deposition in Nebraska instead of the principal place of business in Florida); *M.F. Bank Restoration Co. v. Elliott, Bray & Riley,* 1994 WL 8131, at *1, *4 (E.D.Pa. Jan. 11, 1994) (ordering the corporation to produce two managing agents for a deposition in the forum district); *Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 171–72 (S.D.N.Y.1985) (ordering a deposition of the corporate defendant in the forum rather than California). Federal courts have used this power to compel the appearance of corporate personnel residing outside of the United States. *See Rosenruist–Gestao E Servicos LDA v. Virgin Enters. Ltd.,* 511 F.3d 437, 446 (4th Cir.2007) ("Foreign corporations that ·are subject to the personal jurisdiction of a district court can be and often are required to produce officers, directors or managing agents—regardless of where such witnesses personally reside—in the United States for a Rule 30(b)(6) deposition."); *Bro– Tech Corp. v. Thermax, Inc.,* 2006 WL 3337496, at *3 (E.D.Pa. Nov. 16, 2006) (ordering the corporate designee to travel from India to Philadelphia for a deposition); *United States v. One Parcel of Real Estate at 5860 N. Bay · Road,* 121 F.R.D. 439, 440–41 (S.D.Fla.1988) (ordering directors of the defendant corporation to Florida under a threat of drawing negative inferences against the corporation). The same power enables a court to compel the corporate-party to produce a witness in the ·jurisdiction for trial.

**20.** *See, e.g., Vichi,* 2009 WL 4345724, at *13 (discounting the compulsory process factor because "to the extent that several of the nonparty witnesses ... allude[d] to are either employees of [defendant] or its subsidiaries, 'it must be presumed that they would be paid by [defendant] and consequently, are under [defendant's] control and would appear in ... Delaware ... at [defendant's] request. To the extent these persons are fact witnesses, their testimony could be obtained by deposition.' " (quoting *HFTP Invs., LLC v. ARIAD Pharm. Inc.,* 752 A.2d 115, 123 (Del.Ch.1999))); *Petroplast Petrofisa Plasticos S.A.,* 2009 WL 3465984, at *5–6 (ignoring any concerns about defendant's employees being subject to process and stating "[defendant] is fully capable of presenting the testimony of any witness who cannot be compelled to testify in Delaware through either deposition, videoconference, or both"); *LeCroy Corp. v. Hallberg,* 2009 WL ·3233149, at *8 (Del.Ch. Oct. 7, 2009) (quoting *HFTP Invs., LLC* passage);

### 3. The Existence Of A Competing Action

The defendants contend that this matter should be litigated in New York. NYHC is a New York corporation, and the defendants argue that all of the individuals would be subject to jurisdiction there for all purposes. They stress that in *Glatzer*, a different plaintiff and a different law firm sued a different NYHC board in New York over the First Settlement, and part of their affection for the Empire State likely stems from wistful remembrance of a pleadings-stage victory there. In addition, Hamilton Partners is not a Delaware citizen; it is a New Jersey limited partnership. It could just as easily pursue its claims by taking the Holland Tunnel as by crossing the Delaware Memorial Bridge.

 No other action is currently pending. Although Delaware *forum non conveniens* cases have focused on the mere existence of a competing action and the timing of its filing, an equally (if not more) important aspect is the degree to which significant judicial resources already have been expended on a matter. If a judge in one forum has invested actual, substantive effort in a case, a competing forum should consider carefully whether one of its judges should make a similar case-specific investment. This factor will not be outcome-determinative: "[S]unk costs are sunk," and it still may be efficient for a different court to proceed. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Certain Underwriters at Lloyd's of London*, 2010 WL 3724745, at *5 (Del.Ch. Sept. 24, 2010) (transferring action to Superior Court because of its expertise in insurance matters and the availability of the Complex Commercial Litigation Division despite prior investment of judicial resources in ruling on motion to dismiss). Because I have expended significant time and effort in conducting two hearings on the defendants' motions to dismiss, entertaining a motion to expedite in the Enterologics Action, and issuing this opinion, this factor favors retaining the case.

### 4. All Other Relevant Factors and the Balancing

 The final *Cryo–Maid* factor allows a court to take into account any other factors that might affect the *forum non conveniens* analysis. The strongest argument against a Delaware forum is NYHC's status as a New York corporation. As Vice Chancellor Strine has explained:

> The Delaware courts have long asserted that this state has a compelling interest in the efficient and consistent application of its laws governing business entities. For that reason, our courts have been far less willing to defer to tribunals in other states when unsettled issues of Delaware law are at stake. These rulings have recognized the reality that it is often judicial decisions that give practitioners the practical guidance they need about how much discretion their clients have to act. Those rulings also suggest that Delaware has a related and equally important interest in affording comity to the courts of other jurisdictions when a dispute arises under foreign business law.
>
> . . .

*Brandin v. Deason*, 941 A.2d 1020, 1025–26 (Del.Ch.2007) ("[A]vailability of compulsory process for witnesses ... deserve[s] relatively little weight in the court's analysis.... [T]he court can allow the deposition testimony of these individuals, should they refuse to appear at trial in Delaware, to be admitted into evidence, and stands ready to grant commissions to take those depositions should it prove necessary." (internal footnote omitted)); *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.*, 668 A.2d 763, 769 (Del.Super.1995) (giving little weight to compulsory process factor, as "video or other trial depositions can be taken").

If we expect that other sovereigns will respect our state's overriding interest in the interpretation and enforcement of our entity laws, we must show reciprocal respect. In particular, that means giving more respect to the shared expectations of the owners and managers of a business entity that their internal affairs should [be] governed by expert determinations made by jurists in the domicile of the entity, and much less to the desires of a plaintiff who for tactical reasons seeks to have a Delaware judge make a determination of foreign law. [Failure to do so] risks undermining the certainty of application that business entities depend upon, and should, in my view, be given extremely heavy weight in a rational forum non conveniens analysis.

*Diedenhofen–Lennartz v. Diedenhofen,* 931 A.2d 439, 451–52 (Del.Ch.2007); *accord Taylor v. LSI Logic Corp.,* 1996 WL 361505, at *4–5 (Del.Ch. June 21, 1996) ("The scope of [defendant's] fiduciary duties ... are defined by Canada law and should be interpreted by a Canada court.... It is not in the best interest of this Court to allow this case to proceed in Delaware.... It simply makes sense to conclude Canada's courts have a greater interest in the outcome of this case ...."), *rev'd,* 689 A.2d 1196 (Del.1997) (applying *forum non conveniens* analysis in a manner suited to a bilateral dispute not involving entity issues or the internal affairs doctrine and holding that then-Vice Chan-

cellor Steele's ruling was an abuse of discretion).

I agree whole-heartedly with Vice Chancellor Strine's observations. NYHC's status as the parent entity gives rise to a forceful argument that public investors like Hamilton Partners should look to the New York courts to resolve intra-corporate disputes. If not for the prominent use of a Delaware transaction vehicle, the significant roles played by two Delaware entities in a highly suspicious transaction, and the direct involvement of Delaware fiduciaries in a well-pled loyalty breach, I would incline towards dismissing this case so that it could be re-filed in New York. But in light of Delaware's strong interest in policing against duty of loyalty violations and the misuse of its entities for fraudulent purposes, the double derivative claim on behalf of Bio Balance against the fiduciaries of a Delaware corporation should and will be adjudicated here.

### III. CONCLUSION

The Complaint is dismissed to the extent it asserts a standard derivative action on behalf of NYHC. In all other respects, the motions to dismiss are denied. IT IS SO ORDERED.