# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICROSOFT CORPORATION, a Washington Corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 8092-VCP |
| PATENT REVENUE PARTNERS, LLC, a California Limited Liability Company; HENRY FUNG, an Individual; | ) ) ) ) | |
| Defendants, and | ) ) ) ) | |
| VADEM, LTD., a British Virgin Islands International Business Company; and VADEM, a California Corporation; | ) ) ) ) | |
| Nominal Defendants. | ) ) | |

## MEMORANDUM OPINION

Submitted: June 1, 2015
Decided: October 15, 2015

Jeremy D. Anderson, Esq., Joseph B. Warden, Esq., FISH & RICHARDSON P.C., Wilmington, Delaware; Lauren A. Degnan, Esq., FISH & RICHARDSON P.C., Washington, D.C.; *Attorneys for Plaintiff Microsoft Corporation.*

William D. Sullivan, Esq., William A. Hazeltine, Esq., Elihu E. Allinson, III, Esq., SULLIVAN HAZELTINE ALLINSON LLC, Wilmington, Delaware; *Attorneys for Defendants Patent Revenue Partners, LLC and Henry Fung.*

R. Karl Hill, Esq., Kevin A. Guerke, Esq., SEITZ, VAN OGROP & GREEN, P.A., Wilmington, Delaware; *Attorneys for Defendant St. Clair Intellectual Property Consultants, Inc.*

Kurt M. Heyman, Esq., Dominick A. Gattuso, Esq., PROCTOR HEYMAN ENERIO LLP, Wilmington, Delaware; *Attorneys for Nominal Defendants Vadem, Ltd. and Vadem.*

**PARSONS, Vice Chancellor.**

This action arises from the restructuring of a British Virgin Islands ("BVI") company in late 1999 and early 2000. Under the restructuring, the BVI company became a holding company and spun off its assets into four subsidiary operating companies in exchange for substantial equity interests in each of those operating entities. The derivative plaintiff, a stockholder in the BVI company, alleged that one of the company's directors breached his fiduciary duties to the company by using the restructuring fraudulently to obtain a larger financial stake in some of the company's intellectual property and usurped the company's opportunity to sell that intellectual property to a third party at a time when the company was experiencing financial difficulty. The derivative plaintiff initially alleged that three entities and another individual conspired with the director to commit, or aided and abetted, his alleged breaches of fiduciary duties. The claims against two of those entities and the individual were dismissed earlier in this action, leaving only the derivative plaintiff's claims for breaches of fiduciary duties against the director defendant and for conspiracy or aiding and abetting against the one remaining entity. The plaintiff seeks, among other relief, damages for the director's breaches of fiduciary duties and rescission of the resulting fraudulent intellectual property transaction with the company.

Before even considering the merits of this case, I must answer the important and fact-intensive threshold question of whether this Court has jurisdiction over the director and the remaining entity. The defendants argue the plaintiff has failed to demonstrate that this Court has personal jurisdiction over either: (1) the director under Delaware's

1

Long Arm Statute and constitutional due process; or (2) the remaining entity under the conspiracy theory of jurisdiction. Having considered the evidence presented over the course of a four-day trial, the parties' pre- and post-trial briefs, and their post-trial oral arguments, I conclude, for the reasons set forth below, that this Court lacks jurisdiction over both of the remaining defendants. I therefore dismiss this case with prejudice.

## I. BACKGROUND

### A. The Parties

Plaintiff, Microsoft Corporation ("Microsoft"), is a Washington corporation with its principal place of business at One Microsoft Way, Redmond, Washington. Microsoft continuously has owned Series F Preferred Stock in Nominal Defendant Vadem Ltd. since 1999.

Nominal Defendant Vadem, Ltd. ("Vadem," "Vadem BVI," or the "Company") is a privately held international business company incorporated under the laws of the British Virgin Islands with its principal place of business in Santa Clara, California.

Nominal Defendant Vadem ("Vadem California") is a California company with its principal place of business at the same address as Vadem BVI. Vadem California is a wholly owned subsidiary of Vadem BVI and was the former owner of certain patents related to power management and conservation for computer systems (the "Vadem Patents").

Defendant Henry Fung is a co-founder of Vadem, its former Chief Technology Officer, and its current CEO. Fung is one of two current directors on Vadem BVI's board of directors (the "Vadem BVI Board" or the "Board"), and has served as a director

2

since Vadem's inception in 1993. Fung is the named inventor of the Vadem Patents. In addition, Fung was a founder and director and the CEO of Amphus, Inc. ("Amphus"), a now-dissolved Delaware corporation and former defendant in this case. When Amphus was founded, Fung owned 7.9 percent of the stock in Vadem. Fung also is a managing member of Defendant Patent Revenue Partners, LLC ("PRP").

Defendant PRP is a California limited liability company with its principal place of business in the same California office as Vadem. PRP was formed on December 24, 2001, and in 2008, it replaced Amphus as the recipient of certain revenue streams related to the Vadem Patents from St. Clair, a Michigan corporation and former defendant in this case.

## B. Facts

### 1. The Vadem BVI Board forms Amphus

In the mid-1990s, Vadem BVI developed and marketed certain computer-related products, including an early Windows-compatible tablet, the CLIO. In 1998, Microsoft became interested in Vadem BVI's handwriting recognition technology and performed due diligence on the Company. By 1999, Microsoft acquired the handwriting recognition technology for $10 million and invested another $10 million in Vadem BVI. In late 1999, Vadem BVI was struggling financially, as the CLIO was not performing on the market, and the Company explored ways to restructure to improve stockholder value. The Vadem BVI Board decided to transform Vadem into a holding company and spin off several new operating entities, which would receive certain subsets of Vadem's assets and business in exchange for a substantial stake in each operating company's equity. The

3

Board asked members of management, including Fung and then-CEO John Zhao, each to develop a business plan for one of the spin-off entities to be presented to the Board at its December 6, 1999 meeting.

At the December 6 meeting, the designated managers proposed ideas for each new operating company, including the new entity's ownership structure, based on guidelines provided to them by the Board. Edmund Ku, Vice President of Systems for Vadem BVI's CLIO division, proposed MobileWorks, which would focus on further development of the CLIO.[1] Fung proposed forming a new entity named Amphus, Inc., which would inherit Vadem BVI's chip product business and related technology. Fung proposed the same ownership structure for Amphus as the management had proposed for three other spin-off entities—*i.e.*, Vadem BVI would retain a forty-percent interest, the founder (Fung) would receive a twenty-percent interest, and the remaining forty-percent would be divided among the other former-Vadem BVI employees of the new entity.[2]

---

[1]    MobileWorks never was formed, and the CLIO later was sold to a third party. JX 123.

[2]    Zhao gave Fung the same template for Amphus's ownership structure as he had given to the managers of the other spin-offs. Trial Tr. ("Tr.") 332 (Fung). Where, as here, the identity of the cited witness is not evident from the accompanying text, it is indicated parenthetically by the witness's surname. This testimony comports with Fung's deposition testimony in the Patent Action that Amphus's ownership structure was "consistent with the other spin-outs." Fung Dep. 457. According to Hugh Barnes, an outside director of Vadem BVI, the ownership structure of the spin-offs was discussed at the Board level and was "never attributed to Henry [Fung]." Barnes Dep. 146. According to Peter Thomas, another director of Vadem BVI at the time of the restructuring, "Henry did not define what percent he was going to get [in Amphus]. The [B]oard defined that." Tr. 516.

The purpose of each new operating company's structure was to "maximize their ability to incentivize employees and to attract additional capital."[3] The Board unanimously approved the formation of the new entities, including Amphus.[4]

BJ Olson, Vadem BVI's general counsel, worked with Vadem's outside counsel, Bay Venture Counsel, LLC ("Bay Venture") to decide on the place of incorporation for Amphus.[5] On December 8, 1999, Greg Beattie, senior partner at Bay Venture, incorporated Amphus in Delaware.[6] On December 15, 1999, Beattie appointed Fung, Michio Fujimura, and Barnes as directors of Amphus.[7]

Shortly after the approval of the spin-off companies, the Board began to allocate assets among the four new entities and engaged KPMG to provide an outside valuation perspective on the restructuring. The Board asked Fung, as CTO, to work with Olson to distribute Vadem BVI's intellectual property among the spin-offs based on the technology of each new company.[8] The Board knew of, and sanctioned the assignment

---

[3]  JX 84.

[4]  JX 61.

[5]  Fung testified that he did not ask Beattie to file the certificate of incorporation; instead, the incorporation of Amphus was "between [Beattie] and BJ Olson." Tr. 340.

[6]  JX 62.

[7]  JX 64.

[8]  Tr. 351-50 (Fung).

5

of, the Vadem Patents to Amphus, because they related to Amphus's business.[9] Those patents, therefore, were included in KPMG's valuation of Amphus. On December 31, 1999, KPMG submitted its final valuation analysis, which valued Amphus at $1.9 million.[10] In that valuation, KPMG did not assign any value to the Vadem Patents based on discussions it had had with Amphus management, who indicated that the patents had not generated any licensing revenue and faced diminished possibilities of earning future royalties.[11] Although the record is not entirely clear, I infer from the evidence presented that Fung was one of the managers who had discussions with KPMG.

On January 21, 2000, the Board held another meeting at which the directors approved the formation of, and transfer of Vadem BVI assets to, the four new operating companies. In addition, the Board increased Vadem's interest in Amphus from forty-percent to fifty-percent and its interest in Infolio, another of the new entities, from forty-percent to sixty-six-percent. The Board did not provide any justification for these decisions.[12]

---

[9] *Id.* In his deposition, Zhao explained that "Amphus, as it was designed as a going concern in chip business, would have all assets relating to running of the chip business including, but not limited to the [Vadem Patents]." Zhao Dep. 155. Similarly, Barnes thought "the [Vadem Patents] were always part of . . . what Henry considered necessary to [implement the USB peripherals vision as defined in his presentation], because a lot of what he was doing with the USB stuff depended on low power." Barnes Dep. 62-63.

[10] JX 66.

[11] *Id.*

[12] JX 74.

6

On March 7, 2000, Vadem BVI and Amphus executed a Bill of Sale to transfer various assets, including the Vadem Patents, to Amphus. On April 26, 2000, Vadem BVI and Amphus executed a stock purchase agreement pursuant to which Vadem BVI was issued just over fifty-percent of Amphus's issued and outstanding stock. Finally, Vadem California formally assigned the Vadem Patents to Amphus in June 2000.

## 2. Amphus sells the Vadem Patents to St. Clair and forms PRP

Recognizing that Amphus needed cash to continue the chip product business and to develop its related low power, high density servers, Fung, as CEO of the new entity, sought to raise capital by licensing its intellectual property to third parties.[13] Fung discussed this initiative with the Amphus board.[14] Amphus soon entered into negotiations with St. Clair for the sale of the Vadem Patents, and on June 16, 2000, St. Clair agreed to purchase them from Amphus for $300,000 plus giving Amphus a right to the first $1 million in revenue generated by the Vadem Patents and a fifty-percent share

---

[13] Fujimura did not question Fung's action in this regard. He testified "that fundraising is supposed to be done by CEO. CEO's job is fundraising." Fujimura July 31, 2013 Dep. 127.

[14] The Amphus April 21, 2000 board meeting minutes state:

> The Board reviewed status of engineering projects, the status of merger discussions with Scenix and Transmeta, a proposal that the Company consider negotiating a sale of its power management patent portfolio to a third party for implementation of a licensing program and the assignment of any revenue generated thereby to a to-be-formed LLC whose membership will be determined at a later date.

JX 92.

7

of any revenue over the first $1 million. The latter percentage later was reduced to thirty-percent. The Amphus board also recommended the creation of a separate entity to receive any revenue streams from the Vadem Patents, and at the November 20, 2000 Vadem BVI Board meeting, at which Microsoft's Board observer Sanjay Chheda was present, the Board approved the creation of PRP for this purpose. Neither Chheda nor any other Microsoft agent objected.[15] At its inception, PRP had the same ownership structure as Amphus. Thus, Vadem received a fifty-percent interest in PRP, and Fung received a twenty-percent interest.[16] Around this time, Fung also began to identify potential infringers of the Vadem Patents for St. Clair,[17] but he did not perform any detailed validity or infringement studies.[18]

### 3. Amphus dissolves

In or around 2007, Vadem BVI and Amphus decided to dissolve Amphus.[19] In preparation to dissolve the corporation, Amphus retained Serendib Advisors ("Serendib") to value the portion of Amphus's business that was to be sold to Vadem BVI, including Amphus's right to receive potential revenue from the Vadem Patents in the future. As of 2007, Amphus had not received any revenue from the Vadem Patents, and Serendib did

---

[15] JX 128.

[16] JX 145.

[17] JX 89.

[18] Tr. 201.

[19] JX 178.

8

not assign any value to Amphus's right to receive such revenue in the future.[20]  On May 28, 2008, Amphus and St. Clair amended their patent sale agreement to provide that ongoing revenue from the Vadem Patents would be paid to PRP instead of Amphus.[21]  On December 24, 2008, Amphus officially dissolved.  While the right to the potential revenue from the Vadem Patents remained with PRP, all of Amphus's other assets were purchased by Vadem BVI and St. Clair.

**4.      Fung consulted for St. Clair before it commenced its patent infringement suit against Microsoft's customers**

The same year Amphus was winding up, St. Clair hired Fung as a patent consultant to conduct patent validity and infringement studies on some of the patents it owned.  On April 12, 2008, Fung entered into a contract with St. Clair, in which St. Clair agreed to pay him a monthly fee of $10,000 and an additional $250 per hour for every hour he worked in excess of fifty hours in a given month.[22]  St. Clair renewed its contract with Fung a year later, but changed the compensation arrangement.  St. Clair agreed to pay Fung $250 per hour with no monthly flat fee in exchange for his services conducting similar validity and infringement studies and assisting in the prosecution of the company's patent applications.[23]  St. Clair continued to pay Fung for his consulting

---

[20]      JX 173.

[21]      JX 186.

[22]      JX 179.

[23]      JX 180.

services through the beginning of 2012.[24] By the time of the trial in this action in May 2014, Fung still was filing patent applications for St. Clair, but he no longer performed validity or infringement studies for the company.[25]

On May 15, 2009, St. Clair filed the first of two patent infringement suits in the United States District Court for the District of Delaware (the "Delaware District Court") against several companies to which it previously had offered to license the Vadem Patents (the "Patent Action"). Because some of St. Clair's infringement claims implicated features of Microsoft Windows, Microsoft commenced its own declaratory judgment action against St. Clair in the Delaware District Court. That action sought a declaration that Microsoft Windows did not infringe the Vadem Patents that were asserted against Microsoft's customers and that those patents were invalid. All of these actions ultimately were consolidated (the "Patent Action").

### C.    Procedural History

On October 14, 2011, Microsoft filed its original verified complaint in this action against Defendants Fung, Amphus, St. Clair, Fujimura, and PRP ("Defendants") and against Nominal Defendants Vadem BVI and Vadem California. Microsoft asserted both direct claims on behalf of itself and derivative claims on behalf of Vadem BVI. On April 27, 2012, this Court dismissed Microsoft's direct claims and held that it had to seek leave from the High Court of the British Virgin Islands (the "BVI High Court") before it could

---

[24]    JX 256, 224.

[25]    Tr. 159 (Fung).

10

proceed with a derivative suit on behalf of Vadem BVI. This Court also ruled that Microsoft could seek to re-file its derivative claims, if it obtained the necessary leave from the BVI High Court. After applying to the BVI High Court, Microsoft received the required leave on November 9, 2012, and on December 11, 2012, Microsoft filed its verified derivative complaint (the "Complaint") in this second action against the same Defendants.

Defendants then moved to dismiss the Complaint. On October 31, 2013, this Court issued a Memorandum Opinion,[26] granting Defendants' motion with respect to two Defendants. Specifically, the Memorandum Opinion held that Amphus lacked the capacity to be sued under 8 *Del. C.* § 278 and that this Court did not have personal jurisdiction over Fujimura under either 10 *Del. C.* § 3114 or § 3104(c). In addition, the Court denied Defendants' motion to dismiss for lack of personal jurisdiction over Fung, because Fung may have "transact[ed] business"[27] in Delaware within the meaning of the Delaware Long Arm Statute based on Microsoft's initial showing that the formation of Amphus, as a Delaware corporation, and as part of an alleged conspiracy, might be attributable to Fung.

After discovery, Defendants renewed a number of their arguments in a motion for summary judgment. In an oral ruling on January 7, 2014, this Court granted summary

---

[26]   *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *1 (Del. Ch. Oct. 31, 2013).

[27]   10 *Del. C.* § 3104(c)(1).

11

judgment in favor of St. Clair, and all claims against it were dismissed. The Court denied Defendants' motion for summary judgment for lack of personal jurisdiction over Fung and PRP, stating that "even though Microsoft faces an uphill battle in establishing this Court's jurisdiction over Fung at trial, there are outstanding issues of material fact that must be addressed before I can rule definitively on that issue."[28] The Court also denied Microsoft's motion for summary judgment on its claims against Fung and PRP "because of the real possibility that this Court lacks jurisdiction over Fung."[29]

I presided over a four-day trial from May 12-15, 2014. On June 5, 2014, I issued an order of referral for mediation,[30] and the parties participated in mediation on July 2, 2014. Unable to reach agreement during mediation, the parties engaged in briefing on a motion by Microsoft to extend the scheduling order or to compel St. Clair to supplement its discovery responses in the hope of facilitating settlement discussions. No settlement was reached. The parties also briefed extensively the threshold question of personal jurisdiction over Fung and PRP and Microsoft's substantive claims against those two remaining defendants. I heard post-trial argument on June 1, 2015. This Memorandum

---

[28] Apr. 8, 2014 Teleconf. Tr. ("Apr. 8 Tr."), Docket Item ("D.I.") 270, at 9.

[29] *Id*. at 18.

[30] Order of Referral for Mediation, D.I. 288.

12

Opinion reflects my post-trial findings of fact and conclusions of law on the dispositive issue of personal jurisdiction.[31]

## D. Parties' Contentions

Microsoft asserts five of its original seven derivative counts on behalf of Vadem BVI against Fung and PRP. First, Microsoft claims that Fung repeatedly breached his fiduciary duties to Vadem BVI by: (1) inducing Vadem BVI to transfer the Vadem Patents to Amphus by deliberately misrepresenting the value of the Vadem Patents to Vadem BVI; (2) engaging in self-dealing in negotiating the terms of the transfer of the Vadem Patents from Vadem BVI to Amphus; (3) failing to disclose to Vadem BVI or its agents Fung's belief that the Vadem Patents were worth hundreds of millions of dollars; (4) falsely representing to Serendib in 2007 that the Vadem Patents had no value; (5) destroying Vadem BVI documents in 2010 to hide his breaches of fiduciary duty; and (6) causing Vadem BVI to oppose Microsoft's lawsuits in Delaware and the BVI in 2010 and 2011.[32] The second claim is against Fung and PRP for conspiracy to commit, or aiding and abetting in, Fung's breaches of fiduciary duties.[33] Third, Microsoft claims that Fung fraudulently induced Vadem BVI to transfer the Vadem Patents to Amphus for nominal

---

[31]  In addition, St. Clair moved for an award of its attorneys' fees and costs. After full briefing, that motion also was argued on June 1, 2015. I address St. Clair's motion in a separate Memorandum Opinion being filed concurrently with this opinion.

[32]  Compl. ¶¶ 39-48.

[33]  *Id.* ¶ 53.

13

consideration by misrepresenting their value to the Vadem BVI Board.[34] Fourth, Microsoft asserts that Fung usurped Vadem BVI's corporate opportunity to sell the Vadem Patents to St. Clair or a higher bidder.[35] Finally, the fifth claim accuses Fung and PRP of engaging in a conspiracy to commit, or aiding and abetting in, Fung's usurpation of Vadem BVI's corporate opportunity.[36]

Defendants counter that this action should be dismissed because this Court lacks personal jurisdiction over Fung under Delaware's Long Arm Statute and, therefore, also lacks jurisdiction over PRP under the conspiracy theory of jurisdiction.[37] Defendants further argue that even if this Court has personal jurisdiction over Fung and PRP, Microsoft's claims are time-barred by the applicable statute of limitations and the equitable doctrine of laches.[38] Finally, to the extent that any of Microsoft's claims are not time-barred, Defendants contend that Microsoft, together with the holders of a majority of the shares of Vadem BVI stock, executed actions by written consent, and thereby ratified the restructuring transactions. Thus, Defendants assert that, under BVI law, Microsoft is barred from challenging those transactions.[39]

---

[34]     *Id*. ¶¶ 60-61.

[35]     *Id*. ¶ 79.

[36]     *Id*. ¶ 85.

[37]     Defs.' Opening Post-Trial Br. ("Defs.' Opening Br.") 12-25.

[38]     *Id*. at 44.

[39]     *Id*. at 26.

## II. ANALYSIS

### A. Personal Jurisdiction Over Fung

#### 1. Standard

Before considering any issues on the merits, I must address the important and fact-intensive threshold question of whether this Court has jurisdiction over Defendants Fung and PRP. To show a basis for personal jurisdiction over a nonresident defendant in Delaware, the plaintiff must demonstrate: "(1) a statutory basis for service of process; and (2) the requisite 'minimum contacts' with the forum to satisfy constitutional due process."[40] Microsoft avers that this Court may exercise personal jurisdiction over Fung under subsection (c)(1) of Delaware's Long Arm Statute, which provides:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) [t]ransacts any business or performs any character of work or service in the State.[41]

Forming a Delaware entity as part of a wrongful scheme constitutes a "transaction of business" within the meaning of Section 3104(c)(1).[42] Further, "a party that forms a

---

[40] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *6 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (TABLE).

[41] 10 *Del. C.* § 3104(c)(1).

[42] *Conn. Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011); *Cairnes v. Gelmon*, 1998 WL 276226, at *3 (Del. Ch. May 21, 1998).

Delaware entity as part of a wrongful scheme has constitutionally sufficient 'minimum contacts' with Delaware for the purposes of personal jurisdiction."[43]

Perhaps the most critical question here is whether Fung caused Amphus to be formed as a Delaware corporation to further his allegedly wrongful scheme, and thereby transacted business in this state. This Court has stated that to satisfy the transacting business requirement for personal jurisdiction, a defendant's participation in the "formation" of a Delaware entity must constitute something beyond "just creating [the entity] in Delaware."[44] Moreover, "a corporate director or officer of a foreign corporation cannot be haled into a Delaware court for an act of the corporation simply because the officer or director has directed the corporation to take that act."[45] In this case, Microsoft needs to establish that Fung had a "particularly meaningful role in bringing about [Amphus's] formation" as a Delaware business entity.[46]

### 2. Fung's involvement in the formation and operation of Amphus

First, Microsoft argues that Fung is subject to this Court's jurisdiction, because he formed Amphus as part of a wrongful scheme, as evidenced by the fact that he proposed

---

[43] *Microsoft*, 2013 WL 5899003, at *9 (citing *Papendick v. Bosch*, 410 A.2d 148, 152 (Del. 1979)).

[44] Apr. 8 Tr. 8; *see In re Mobilactive Media, LLC*, 2013 WL 297950, at *28 (Del. Ch. Jan. 25, 2013) ("'But merely participating in the formation of a Delaware entity, without more, does not create a basis for jurisdiction in Delaware.'") (quoting *Pinkas*, 2011 WL 5222796, at *2).

[45] *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1201 (Del. Ch. 2010) (quoting *Ruggiero v. FuturaGene, plc*, 948 A.2d 1124, 1134 (Del. Ch. 2008)).

[46] Apr. 8 Tr. 7-8.

16

Amphus's formation for his own benefit.[47]  Defendants counter that Vadem BVI, not Fung, formed Amphus.[48]  To support its position, Microsoft relies on Fung's Patent Action deposition, in which he stated he wanted to form Amphus "so [he] can continue to pursue [his] dream."[49]  I do not find, however, that Fung's testimony is persuasive on this point.  Vadem BVI was managed by an independent board of directors, and as I previously held, "Fung did not control the [Board] or its management or its shareholder base."[50]  Indeed, the testimony of the other Vadem directors, and even the testimony of Fung in the same Patent Action deposition,[51] shows that the Vadem BVI Board, independently of Fung, decided to restructure the Company to try to maximize opportunities to attract financing and salvage value for investors after the Company had

---

[47]     Pl.'s Ans. Post-Trial Br. ("Pl.'s Ans. Br.") 3.

[48]     Defs.' Opening Br. 15.

[49]     Fung Dep. 219.

[50]     Jan. 7, 2014 Oral Arg. Pl.'s Mot. Summ. J., Def. St. Clair's Mot. Summ. J., Pl.'s Mot. to Require St. Clair to Escrow, Def. Fung's Mot. to Disqualify, and Part. Rulings of the Court Tr., D.I. 283, at 111.

[51]     Microsoft alleges that it was Fung's idea to create Amphus in the restructuring so he could obtain a larger stake in the valuable Vadem Patents, as evidenced by his testimony in the Patent Action that he wanted to "form a new company so I can continue to pursue my dream."  Fung Dep. 219.  Yet, in the same statement, Fung testified that "we [the Board] are in the process of reorganizing, restructuring Vadem" which included forming Amphus.  *Id*.  While Fung may have had his own visions for Amphus, his testimony at deposition and at trial, when combined with the testimony of the other Vadem BVI directors, shows that the Board, not Fung, made the key decisions as to the restructuring and formation of Amphus.

17

run into significant financial difficulty.[52] Fung, as part of that restructuring process, was asked by the Board to make a presentation regarding a potential spin-off entity involving Vadem's chip product business.[53]

Second, Microsoft argues that Fung's manipulation of the asset transfers from Vadem BVI to Amphus demonstrates his involvement in the formation of Amphus.[54] Microsoft avers that formation of a Delaware entity is more than "purely a ministerial act, who filed the right papers,"[55] and includes the determination of the new entity's assets.[56] The record shows, however, that Fung was not involved in the "ministerial act" of filing the right papers. Furthermore, there is no evidence that Fung had any role in deciding to have Amphus formed as a Delaware corporation, rather than a California corporation,

---

[52]    There was a strong consensus among the Board members on the decision to restructure Vadem. "[I]t was a critical business decision we made in an effort to try and get some success out of all the investment that had been made to date in the corporation." Tr. 504-06 (Thomas). Barnes testified that Vadem as a business was failing before the restructuring. Barnes Dep. 26. Zhao stated: "In my mind, I thought we had a lot of responsibilities to these shareholders. We needed to do everything we could to preserve the value and to change strategies so that they may get something out of their investments." Zhao Dep. 36.

[53]    Fujimura stated that Fung was not involved in the idea of restructuring per se. Instead, once the Board proposed the idea of restructuring at the October board meeting, "then Henry start thinking and creating the business plan for Amphus." Fujimura July 31, 2013 Dep. 121. Zhao confirmed that Fung was not the one who proposed the idea of restructuring. "He was asked to present or prepare as part of the overall scheme of restructuring the entire business." Zhao Dep. 313.

[54]    Pl.'s Ans. Br. 5.

[55]    Tr. Post-Trial Arg. 37.

[56]    *Id*. at 38.

18

where Fung was located, or a BVI corporation. Olson, Vadem's general counsel, and Vadem's outside counsel evidently determined that Amphus should be incorporated in Delaware, and then they worked together to accomplish that task.[57] In addition, Fung was involved in the division of Vadem's intellectual property among the spin-offs at the Board's request and with Olson's input.[58] On this point, Microsoft asserts that the evidence shows the Vadem Patents should have gone with the CLIO product line.[59] I have considered this argument, but find that the more reasonable inference from the available evidence is that Fung, acting in his role as a Vadem director, assigned the Vadem Patents to Amphus under the Board's direction, because they were related to the chip product business it had and expected to develop.[60] Finally, to the extent Fung made any representations about the value of the Vadem Patents to the Board or KPMG, I find that the Board did not rely on those representations when deciding to form Amphus and approving the assets to be allocated to it.[61]

---

[57] Tr 340 (Fung).

[58] Tr. 351 (Fung). Thomas testified at trial that all of the founders of the new entities were authorized to work with Olson to make sure that "anything and everything that needed to be done to transfer assets, hire/fire people, whatever, that anything needed to make all of these actions happen was going to take place and not delay." Tr. 559-60.

[59] Pl.'s Ans. Br. 5; Tr. Post-Trial Arg. 43-44.

[60] *See* discussion *supra* note 7.

[61] Barnes stated that even if Fung had made representations to the Board about the value of the patents, they would not have relied on it. "Asking an inventor what the value of his patents are is like asking a composer how beautiful his music is. He is going to be enamored with it." Barnes Dep. 103.

Third, Microsoft avers that the importance of Fung's involvement in the formation of Amphus is demonstrated by his manipulation of Amphus's ownership structure for his own benefit.[62] Defendants counter that the Vadem BVI Board, not Fung, determined Fung's ownership interest in, and the overall ownership structure of, Amphus.[63] Based on the evidence adduced at trial, I find that Defendants' position is correct. The record shows that Amphus's ownership structure as proposed by Fung during his presentation mirrored the ownership structure presented for the three other operating companies. Fung testified in his deposition in the Patent Action that the proposed ownership structure was "consistent with the other spin-outs,"[64] and at trial, he reaffirmed that the equity division for Amphus was based on a template given to him and the other three presenters by the Board.[65] After the four presentations at the December 6, 1999 meeting, the Vadem BVI Board voted unanimously to create Amphus and three other new operating companies. The evidence also shows that, notwithstanding Fung's 7.9% interest in Vadem, the Board had good reason, on behalf of Vadem and its stockholders, to increase Fung's ownership in Amphus to twenty percent. As multiple witnesses testified, Vadem used the increased equity in the spin-offs to incentivize the founders, like Fung, to make the new companies successful.

---

[62]    Pl.'s Ans. Br. 8.

[63]    Defs' Opening Br. 18-19.

[64]    Fung Dep. 457.

[65]    Tr. 332.

In addition, Microsoft argues that Fung intentionally drove KPMG's valuation of Amphus as low as possible, because he knew the purpose of that valuation was to determine Vadem's ownership in the spin-off.[66] The record is not clear as to whether Fung even had discussions with KPMG about the value of the Vadem Patents, but I assume he did, at least indirectly.[67] Additionally, the Vadem directors testified credibly that they believed KPMG's valuation of the Vadem Patents at zero was appropriate, because they had never been litigated or licensed.[68] Even if Fung did mislead KPMG as to his opinion of the value of the Vadem Patents, therefore, the evidence shows that the Board reasonably relied on KPMG's final valuation and their own experience in determining the ownership structure of Vadem's four spin-off entities.

Contrary to Microsoft's argument that Fung intentionally formed a Delaware entity as part of a wrongful scheme, the picture painted by the record is one of a BVI

---

[66] Pl.'s Ans. Br. 8.

[67] KPMG's final analysis assigned no value to the Vadem Patents based on discussions with Amphus management, which would have included Fung. JX 66. Fung, however, did not recall speaking to KPMG directly and testified that if he did convey information to KPMG, he probably did so through Zhao or Amphus's accountants. Tr. 377-78; Fung Dep. 243.

[68] Thomas testified that "[The Vadem patents] had no value unless you litigated and . . . got somebody to pay you because the Courts determined you were somehow violating a patent. Patents don't have any value just sitting there." Tr. 531-32. Vadem director Barnes had extensive, relevant experience with patents, having worked as a design engineer and served on the boards of other technology companies, such as Compaq and Transmeta, Inc. Barnes Dep. 11-12. Barnes confirmed the difficulty of valuing patents. "[U]ntil you've had a patent prosecuted and validated through prosecution, . . . it's very hard to put a value on patents. And I've done a lot of things around patents." *Id*. at 64.

21

technology company struggling financially and its independent Board making an informed and unanimous decision to restructure in order to salvage some value for the stockholders. The Board asked Fung to propose a business plan for one of several spin-off entities that would incorporate Vadem's previous chip business and the relevant assets, including the Vadem patents that would support the proposed business. The Board determined an ownership structure for each spin-off that best would incentivize management of the new entity to be successful and create new value for its stockholders, including Vadem.[69] While the ownership structure and asset transfer decisions were being made and executed in California, Olson and Beattie, not Fung, incorporated Amphus in Delaware.

Additionally, the evidence shows that Microsoft's own contemporaneous actions in or before 1999 and through 2000 were not inconsistent with Fung's testimony or the testimony of the other Vadem directors. Before purchasing the handwriting recognition technology, Microsoft chose to limit its due diligence inquiries to Vadem's intellectual property and technology related to the handwriting recognition technology, despite its

---

[69] Zhao said the Board gave the founders a larger equity stake in the new entities because:

> [O]ne way of motivating these people is to have them have ownership. So we issued them a promissory note saying fight on, I don't have money to pay your salary, but if you fight on, and this may be something—if this is something, your portion will compensate for your sacrifice today.

Zhao Dep. 165-66.

latitude as a $20 million investor to ask "for just about anything."[70]  Further, during

Vadem BVI's restructuring, Microsoft only wanted assurance that nothing would

jeopardize or encumber the handwriting recognition technology or patents, and it did not

express concern over any other facet of the restructuring.[71]  Later, Chheda attended the

November 20, 2000 Board meeting at which Amphus's sale of the Vadem Patents to St.

Clair and the formation of PRP were discussed.  The evidence again does not indicate any

objections by Microsoft or its agents.[72]  Having considered the evidence presented at trial

and the post-trial briefing and arguments, therefore, I conclude that Fung did not form

Amphus as a Delaware entity as part of a wrongful scheme.

### 3. Fung's participation in the Patent Action

In the alternative, Microsoft argues that this Court has personal jurisdiction over

Fung because his participation in the Patent Action constitutes the transaction of business

in Delaware within the meaning of Delaware's Long Arm Statute.[73]  Microsoft claims

that Fung's early emails, in which he identified potential infringers of the Vadem Patents,

and his later consulting work, caused St. Clair to file the Patent Action in Delaware.  In

support of its argument that these actions support subjecting Fung to jurisdiction in

---

[70]     Tr. 62 (Snyder).  Microsoft could have investigated the Vadem Patents further, but in response to Vadem's inquiry about the scope of Microsoft's due diligence, Microsoft said to limit it to the assets it planned to purchase.  *Id*. at 60-62.

[71]     JX 88.

[72]     JX 128.

[73]     10 *Del. C.* § 3104(c)(1).

23

Delaware, Microsoft relies on this Court's decision in *Sprint Nextel Corp. v. iPCS, Inc.*[74] In that case, the Court found it conceivable that the defendant companies, which were subsidiaries by virtue of a merger they challenged, "could have transacted business in Delaware for purposes of determining personal jurisdiction under § 3104(c)(1)" by filing a complaint against their parent corporation in an earlier action in Delaware.[75]

The *Sprint Nextel* case is not relevant to this action, because St. Clair, not Fung, filed the Patent Action in Delaware. Further, although Fung may have been involved in identifying potential companies against which St. Clair could enforce its patents, there is no evidence Fung controlled St. Clair's decision to file in Delaware the actions for patent infringement that prompted Microsoft to commence its responsive declaratory judgment action in the Delaware District Court. Therefore, even if Fung reasonably could have foreseen St. Clair filing the Patent Action in Delaware, his level of involvement does not rise to the level of conduct necessary to constitute a transaction of business in Delaware for purposes of establishing personal jurisdiction under the Long Arm Statute.

In addition to the lack of evidence of any transaction of business by Fung, there also would be significant due process concerns if this Court purported to exercise jurisdiction over him. The touchstone of the due process inquiry is whether a litigant purposefully availed himself of a forum such that the individual reasonably could expect

---

[74]    2008 WL 2737409, at *1 (Del. Ch. Jul. 14, 2008).

[75]    *Id.* at *9.

to be haled into court in that jurisdiction.[76] Fung reasonably could expect to be haled into a Delaware court for breaching his fiduciary duties to a Delaware entity as a director or officer of that entity. There are no such allegations in this action, however. Furthermore, Microsoft has failed to prove any basis upon which Fung reasonably could have expected to be haled into a Delaware court for breaching his fiduciary duties to a California entity, such as PRP, or a BVI entity, such as Vadem, through the operation of a Delaware entity, such as Amphus, that has no operations in Delaware and conducts no business here. The same is true regarding St. Clair's litigation in Delaware. Microsoft has not adduced any probative evidence that Fung caused, or materially influenced, St. Clair to bring its lawsuits in Delaware. Therefore, I conclude that this Court lacks personal jurisdiction over Fung.

## B. Jurisdiction over PRP

### 1. Standard

Microsoft argues that PRP, a California entity, is subject to this Court's jurisdiction under the conspiracy theory of jurisdiction. "[A] foreign defendant may be subject to jurisdiction in Delaware, despite lacking direct forum contacts of its own, where it acts as part of a scheme in which others engaged in Delaware-directed

---

[76] *See Papendick v. Bosch*, 410 A.2d 148, 152 (Del. 1979).

activity."[77] To establish conspiracy jurisdiction over a nonresident entity, a plaintiff must demonstrate the following five factors:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[78]

The plaintiff must satisfy all five factors to establish jurisdiction over a foreign defendant under the conspiracy theory of jurisdiction.

## 2. Application

Defendants argue that if this Court lacks personal jurisdiction over Fung, then the Court also lacks jurisdiction over PRP because, even if there had been a conspiracy between Fung and PRP, there is no allegation that PRP engaged in any jurisdiction-creating activity in Delaware and, as discussed above, there is no persuasive evidence that Fung engaged in any such activity in Delaware that could be imputed to PRP based on the existence of the alleged conspiracy. Microsoft explicitly has agreed with Defendants that "this Court lacks jurisdiction over PRP to the extent it lacks jurisdiction

---

[77] *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1197 (Del. Ch. Dec. 15, 2010) (citing *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 225 (Del. 1982)).

[78] *Istituto Bancario*, 449 A.2d at 225.

over Fung."[79] But, even if Microsoft had not conceded that a lack of jurisdiction over Fung precludes the existence of jurisdiction over PRP, its arguments under *Istituto Bancario* are unavailing. Specifically, Microsoft argues that the third factor—a substantial act or substantial effect in furtherance of the conspiracy in Delaware—is satisfied by Fung's formation of Amphus.[80] As I found *supra*, however, the Vadem BVI Board, and not Fung, formed Amphus. Therefore, Microsoft has not satisfied the *Istituto Bancario* test and has failed to demonstrate that this Court has jurisdiction over PRP.

## III. CONCLUSION

For the foregoing reasons, I dismiss this case in its entirety with prejudice as to the two remaining Defendants, Fung and PRP. Based on that decision, I do not reach the parties' arguments on the merits.

**IT IS SO ORDERED**.

---

[79] Pl.'s Ans. Br. 15 n.13.

[80] Pl.'s Pre-Trial Br., D.I. 264, at 37.